STATE of Minnesota, Respondent,

v.

Paul Kermit NESS, Appellant.

No. A03–1187.

Supreme Court of Minnesota.

Jan. 10, 2006.

Paul Engh, Minneapolis, MN, for Appellant.

Mike Hatch, Attorney General, Kelly O'Neill Moller, Assistant Attorney General, St. Paul, MN, Joseph A. Evans, Becker County Attorney, Detroit Lakes, MN, for Respondent.

## OPINION

MEYER, Justice.

Appellant, Paul Kermit Ness, was charged with second-degree criminal sexual conduct, in violation of Minn.Stat. § 609.343, subd. 1(a) (2004), for inappropriately touching an 11–year–old boy during an art class Ness taught. Ness waived his right to a jury trial and the case was tried

to the court. Evidence admitted at trial included sexual misconduct by Ness 35 years earlier with a boy of similar age to the victim in the charged offense. The court found Ness guilty as charged and sentenced him to 25 years' supervised probation.

## I.

Ness, a retired elementary school teacher and administrator, began teaching in the Detroit Lakes area in 1948. He retired from the school district in 1992 but continued to work in the Detroit Lakes Community Education Program as an art instructor.

On Saturday, November 23, 2002, E.M. attended an acrylic painting class taught by Ness. The class was scheduled to run from 9 a.m. to 3 p.m. at a local middle school. E.M. arrived 30 minutes late and was the last of the nine students in the class to arrive. E.M. was also the youngest student; there was one teenage girl in the class and the remaining students were all adults. When E.M.'s mother dropped him off at the middle school, he was greeted with a pat on the back from Ness. Ness reassured E.M. that his tardiness would not affect his ability to catch up to the rest of the class.

The subject for the class that day was a complicated 12–layer nature scene. Several of the students in the class testified that it was Ness's teaching style to walk around the class and assist students as needed. He would hold the student's brush, or paint on the student's canvas, to show the student precisely how to complete a stroke or achieve the desired painting effect. The students also testified that Ness is generally a "touchy feely" person and that Ness paid special attention to E.M. and frequently stopped to help E.M. paint.

The room where the class took place was set up with tables in rows of two with four stools at each table. Ness directed E.M. to a table with an empty seat, and E.M. sat across from an adult student, Willis "Buck" Cummings. E.M. testified that Ness touched him inappropriately at least five times during the art class; twice in the morning and three times in the afternoon. E.M. testified that all of the incidents occurred in substantially the same manner:

> He would come over and ask me if I needed help and he would look, like sometimes say, "Here, let me show you something." And then he would sit down to [sic] the stool next to me and then he would put his arm around me, the other hand he would paint with and then sometimes he would touch my stomach and then work his way down. Other times he would just touch my penis.

Cummings testified that he has known Ness since 1995, and took several art classes taught by Ness. Although Cummings was seated directly across from E.M., he testified that he did not see any inappropriate touching. Cummings admitted that he was focused on his painting at the time and was therefore paying little attention to anything going on around him. Cummings testified that he did notice that Ness paid added attention to E.M., but he considered it appropriate because E.M. appeared disinterested and inexperienced in painting. Cummings also testified that he saw Ness put his arm around E.M.'s shoulders. According to Cummings, he initially assumed that E.M. and Ness were related because Ness was so friendly toward E.M.

Valerie Voigt was also a student in the art class that day and was seated at the set of tables and stools directly behind E.M. Voigt was a former elementary school student of Ness's and an art instructor who had taught art classes that E.M. had previously attended. Voigt testi-

fied that she saw several events that caused her to be concerned that Ness was inappropriately touching E.M. The first incident occurred when it was time for the lunch break. Voigt testified that she saw Ness's hand meander down E.M.'s back, to his waist, around to the front of his lower body, and then out of sight. Voigt believed that when she lost sight of Ness's hands they were near or on E.M.'s groin area. The second and third incidents involved Ness patting E.M. on the buttocks. In the fourth incident, Voigt saw Ness's hands go down E.M.'s back and around to his front and out of sight. Again, Voigt thought Ness's hands to be at or near E.M.'s groin. According to Voigt, the fifth incident occurred when Ness sat on a stool next to E.M. and Voigt saw E.M. pull his legs away from Ness. Voigt testified that the sixth incident occurred when Ness sat on a stool next to E.M., put his hand on E.M.'s knee, and began to move his hand up E.M.'s inner thigh. Voigt attempted to get the attention of a classmate, Kenneth Anderson, but instead she got Ness's attention and he stood up and began to walk around the classroom. After observing the sixth incident, Voigt intervened. Every time thereafter, when Ness sat next to E.M., Voigt left her seat and stood next to E.M.

Ness testified that he probably sat on the stool next to E.M. a few times during the class to give E.M. guidance on his painting. Ness recalled a moment during the class when the students were teasing him about his Norwegian heritage. In response to a comment by E.M., Ness recalled that he "jokingly" grabbed E.M.'s knee and replied, "You can't talk about Norwegians in my class." Ness also recalled an incident before lunch break when he put his arm around E.M. "giving him support" and may have also touched E.M.'s leg and patted it at that time.

At the end of the class, Ness escorted E.M. to the pay phones so that E.M. could call his mother. Voigt watched as Ness escorted E.M. down the hallway, but she did not witness any inappropriate touching. When E.M. could not reach his mother, he and Ness returned to the classroom. Ness then took some remaining art supplies to his car. While Ness was gone, Voigt asked Anderson to remain with her because she was concerned about Ness inappropriately touching E.M. Anderson testified that he witnessed one incident during the class when Ness hugged E.M., but he did not think that the hug was inappropriate. Anderson testified that he paid little attention to E.M. during the class because he was so deeply focused on completing his painting before the class ended.

With Anderson present and Ness out of the room, Voigt asked E.M. about Ness's conduct during the class, specifically asking if Ness had touched him inappropriately. Before E.M. answered, Voigt told E.M. that she had a son. She also asked E.M. if he knew what inappropriate meant. E.M. responded affirmatively and told Voigt and Anderson that Ness had touched him inappropriately. Voigt told E.M. that such touching was wrong, gave him her telephone number, and instructed E.M. to tell his mother and to have his mother call her. Voigt stayed in the classroom until E.M.'s mother arrived.

When E.M.'s mother arrived, she went into the building to pick up her son. She noticed that E.M.'s demeanor had changed since she dropped him off in the morning. Because of his demeanor, she thought that he either did not like acrylic painting or did not do well in the class. She asked E.M. if there was anything wrong. E.M. told her that he would tell her at home.

Once they arrived home, E.M.'s mother asked him to tell her what was bothering

him. E.M. told her that Ness touched him inappropriately during the art class. When E.M.'s mother asked for clarification, E.M. told her that several times during the class Ness inappropriately touched him by placing his hand over E.M.'s clothing in the area of E.M.'s thigh, groin, and penis. E.M. then gave his mother Voigt's telephone number and told her that Voigt was expecting her call. E.M.'s mother called Voigt and Voigt expressed her concern regarding the events that she had witnessed in the classroom. Soon after these conversations, the Becker County Sheriff's Office became involved.

At trial, Ness's theory of the case was that Ness only touched E.M.'s legs and back and had no sexual intent when he did so. Ness asserted that E.M. must have misinterpreted the meaning of his touches. Although Ness conceded that, based on his experience as an educator, it was inappropriate for him to touch E.M., he maintained that his touches were not sexual and were only intended to provide encouragement to E.M.

The court allowed the state to present the testimony of Jeffrey Caron as evidence of other crimes, wrongs, or acts, often referred to as *Spreigl* evidence. Caron was 43 years old at the time of trial and lived in Florida. As a child, Caron lived in Becker County and attended grade school at Washington Elementary School. Ness was the principal at Washington at the same time that Caron attended the school. Caron testified that he was a "combatant" young man while he was a student at Washington. In 1990, Caron pleaded guilty to felony theft, served probation, and had the conviction reduced to a misdemeanor. He also went through two substance abuse programs in 1991 and 1996.

According to Caron, he first became aware of the charges pending against Ness when his mother sent him an article about the allegations against Ness that appeared in the Becker County newspaper. Caron's mother had also written a letter to the prosecutor's office informing the office that Ness inappropriately touched Caron when he was a student at Washington.

At trial, Caron testified about two instances of inappropriate physical contact that Ness had with him when Caron was in the fifth grade. Caron testified that the first incident occurred after a snowball fight that resulted in his being sent to the principal's office. According to Caron, he was in Ness's office explaining the snowball incident to Ness when Ness stood directly in front of Caron, leaned on his desk, and groped himself while he instructed Caron on the inappropriate nature of his playground antics. Caron testified that Ness then sat in an empty chair next to him, grabbed Caron's inner thigh, and slid his hand up Caron's thigh to the groin area. Caron then left the room. When he testified about the second incident, Caron could not recall the circumstances under which he found himself in the principal's office. However, he recalled that when he was in the principal's office, Ness sat down next to him and began groping himself while holding Caron's inner thigh in a way that Caron described as uncomfortable.

Caron also testified that in 1991 he and Ness encountered each other at a public library book sale in Detroit Lakes. Caron recalled that Ness approached him, put his hand around Caron's waist, and attempted to engage in conversation. Caron testified that Ness "looked me in the face and said, 'No hard feeling [sic].'" Caron inferred that Ness's comment related to the inappropriate touching that occurred when Caron was a child.

Caron testified that he did not speak to anyone about the incidents that occurred when he was in fifth grade until he was 25 years old and in a substance abuse treat-

ment program. Caron testified that during a group meeting "it was asked, 'Has anyone here ever experienced inappropriate behavior by an adult?'" According to Caron, he "was taken back by the fact that out of the eight men that were sitting in the room * * * three of them raised their hand almost immediately and I had to raise mine." Caron eventually told his mother that Ness had touched him inappropriately when he was a boy.

When Ness was questioned about Caron's testimony, he recalled that Caron was frequently sent to the principal's office for discipline. Ness also testified that it was possible that he may have grabbed Caron's leg to restrain him from running away, as Caron was prone to do, but Ness insisted that any touching would not have had sexual intent. Ness also insisted that he never groped himself in the presence of Caron, nor did he touch Caron's inner thigh or groin area. With respect to their encounter at the library, Ness testified that it was possible that he greeted Caron with a handshake and a pat on the back, and may have said to him, "Let all bygones be bygones." Ness testified that he was certain that the intent of such a statement would have been to indicate to Caron that he harbored no ill will toward Caron for his poor behavior as a child.

At trial, the court found that "when the veil of mistake or accident or that type of thing arises" *Spreigl* evidence has a place. In so finding, the court stated that it believed that Ness made "a strong argument * * * that this was mistake or that perception was mistaken" and that it "would be tying the hands of the state if I didn't give them at least one opportunity to deal with that issue." In light of these findings, the district court admitted the Caron evidence, but also stated that it would not be applied to determine Ness's guilt of the charged offense. We take this statement to mean that the court would not punish Ness for the Caron incident by finding him guilty of the incident involving E.M. *See* Minn. R. Evid. 105.

The district court found Ness guilty of criminal sexual conduct in the second degree, Minn.Stat. § 609.343, subd. 1(a). It found that the testimony of E.M. was "very credible" and the testimony of Voigt was "credible in and of itself." The court specifically found that "[Ness's] action on the day in question, along with the nature and number of times he touched E.M.'s intimate parts, is by itself sufficient to show beyond a reasonable doubt that [Ness] acted with sexual or aggressive intent." The court added that this finding was "bolstered" by Caron's testimony. Ness was sentenced to 25 years' probation and his contact with anyone under 18 years old was limited to contact under the supervision of another adult.

Ness appealed his conviction to the court of appeals claiming, among other things, that the district court erred in admitting the other-acts evidence. Reviewing the admission of the evidence for abuse of discretion, the court of appeals determined that it was properly admitted. *State v. Ness*, No. A03–1187, 2004 WL 1444952 at *1 (Minn.App. June 29, 2004). The court found that Ness's participation in the incidents involving Caron was clear and convincing, reasoning that the credibility of Caron's testimony was a determination to be made by the district court. *Id.* at *2. The court of appeals was persuaded that Caron's accounts of the incidents were sufficiently detailed for the district court to reasonably have deemed them credible. *Id.* at *1.

The court of appeals also concluded that the *Spreigl* evidence was relevant and material to the state's case in that it demonstrated Ness's modus operandi and lack of mistake. *Id.* at *2–*3, 139 N.W.2d 167.

The court noted that "Ness touched boys of a similar age in a similar manner while acting in a supervisory role." *Id.* at *3, 139 N.W.2d 167. In addition, the court reasoned that the evidence was relevant because in child abuse cases evidence of similar abuse is highly relevant when the issue is whether the charged conduct occurred or whether there was a mistake in the alleged victim's perception. *Id.* With respect to Ness's argument that the *Spreigl* evidence was stale, the court of appeals, relying on a footnote of our decision in *State v. Wermerskirchen,* held that a court is not required to consider a relevance "slope" based on the age of the evidence in cases involving sex crimes. *Ness,* 2004 WL 1444952, at *2 (citing *State v. Wermerskirchen,* 497 N.W.2d 235, 242 n. 3 (Minn.1993)). The argument that the passage of time decreases the relevance of other-acts evidence, the court of appeals stated, "runs contrary to established precedent for sex crimes in this jurisdiction." *Id.* Finally, the court of appeals concluded that the probative value of the Caron evidence outweighed its potential for unfair prejudice. *Id.* at *3. In doing so, the court determined that the potential for unfair prejudice was not substantial in this case because "(1) this was a bench trial; (2) the record reveals that the evidence was used to refute Ness's argument that the contact was mistaken or accidental; and (3) the court adequately considered the strength of the state's case before admitting the evidence." *Id.*

## II.

The sole issue presented to this court is whether the district court committed reversible error when it admitted Caron's testimony as other-acts evidence. Ness argues that proof of his participation in the prior incidents was not clear and convincing because Caron's recollections about them were not sufficiently detailed and Caron's credibility is called into question by his theft conviction and history of substance abuse. Ness further contends that the *Spreigl* evidence is not relevant because of the passage of time between when the Caron incidents occurred and when the incident involving E.M. occurred.[1] Additionally, Ness contends that the Caron incidents are not sufficiently similar to the charged offense to make them relevant because, unlike the conduct involving E.M., they occurred when Caron was alone with Ness and involved Ness touching himself in Caron's presence. Finally, Ness asserts that the probative value of the *Spreigl* evidence is outweighed by its potential for unfair prejudice because it was essentially used to demonstrate his propensity to commit similar offenses, and that this is borne out by the district court's conclusion that Caron's testimony bolstered its finding that Ness touched E.M. with sexual or aggressive intent.

The state contends that Ness's participation in the incidents involving Caron was clear and convincing because Caron provided credible, detailed testimony about the incidents and never lost his memory about them but simply failed to disclose their occurrence until several years later. The state contends that Caron's testimony is relevant because it helped to establish motive, intent, lack of mistake or accident,

---

1. We note that in *Wermerskirchen* we focused on the passage of time between the occurrence of the *Spreigl* incident and the date that the evidence related to the *Spreigl* incident was introduced at the trial for the charged offense. More appropriately, the focus should be on the passage of time between the *Spreigl* incident and the date the charged offense occurred. *See, e.g., State v. Washington,* 693 N.W.2d 195, 201–02 (Minn.2005); *State v. Rainer,* 411 N.W.2d 490, 497–98 (Minn.1987); *State v. Blom,* 682 N.W.2d 578, 601, 612 (Minn.2004).

and common scheme or plan by showing that Ness "sexually touched boys of similar ages in a similar manner while acting as a supervisor of the boys." In addition, the state asserts that Caron's testimony was necessary to rebut Ness's defenses that he did not touch E.M. in a sexual manner and that E.M. had a mistaken perception about Ness's touches. According to the state, the passage of time between the Caron incidents and the incident involving E.M. is of less significance because of the similarities between the incidents that establish Ness's modus operandi, lack of mistake or accident, and intent. Finally, the state argues that the probative value of the other-acts evidence outweighs its potential for unfair prejudice because Ness's case was tried to the court, which limited the use of the evidence to proper purposes.

### III.

We have consistently adhered to the "rule excluding evidence connecting a defendant with other crimes, except for purposes of impeachment * * * if he takes the stand on his own behalf." *State v. Spreigl*, 272 Minn. 488, 490, 139 N.W.2d 167, 169 (1965). This general exclusionary rule is grounded in the defendant's constitutional right to a fair trial. *Id.* at 495, 139 N.W.2d at 171. The danger in admitting such evidence is that the jury may convict because of those other crimes or misconduct, not because the defendant's guilt of the charged crime is proved. We recently said that the "overarching concern" over the admission of *Spreigl* evidence is that it might be used for an improper purpose, such as suggesting that the defendant has a propensity to commit the crime or that the defendant is a proper candidate for punishment for his or her past acts. *State v. Washington*, 693 N.W.2d 195, 200–01 (Minn.2005) (citing *State v. Billstrom*, 276 Minn. 174, 179, 149 N.W.2d 281, 284–85 (1967)).

At common law we recognized various exceptions to this general exclusionary rule, and many of them have been incorporated into Minn. R. Evid. 404(b). All cautions surrounding the use of *Spreigl* evidence notwithstanding, evidence of other crimes, wrongs, or bad acts may be admitted only for limited, specific purposes. Those purposes include showing motive, intent, knowledge, identity, absence of mistake or accident, or a common scheme or plan. Minn. R. Evid. 404(b); *State v. Kennedy*, 585 N.W.2d 385, 389 (Minn.1998).

Our court reviews the district court's decision to admit *Spreigl* evidence for an abuse of discretion. *State v. Blom*, 682 N.W.2d 578, 611 (Minn.2004) (citing *Kennedy*, 585 N.W.2d at 389). "A defendant who claims the trial court erred in admitting evidence bears the burden of showing the error and any resulting prejudice." *Kennedy*, 585 N.W.2d at 389. The procedural safeguards required for the admission of *Spreigl* evidence are designed to ensure that the evidence "is subjected to an exacting review." *Id.* at 390.

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person to show that the person acted in conformity therewith on a particular occasion. Minn. R. Evid. 404(b). Further, such evidence may not be introduced if its probative value is substantially outweighed by its tendency to unfairly prejudice the factfinder. Minn. R. Evid. 403. If the admission of evidence of other crimes or misconduct is a close call, it should be excluded. *State v. Bolte*, 530 N.W.2d 191, 197 (Minn.1995) (citing *State v. Spreigl*, 272 Minn. at 495, 139 N.W.2d at 172).

The court has developed, through the many cases since *Spreigl*, a five-step process to determine whether to admit

other-acts evidence.[2] The steps are: (1) the state must give notice of its intent to admit the evidence; (2) the state must clearly indicate what the evidence will be offered to prove; (3) there must be clear and convincing evidence that the defendant participated in the prior act; (4) the evidence must be relevant and material to the state's case; and (5) the probative value of the evidence must not be outweighed by its potential prejudice to the defendant. *Angus v. State,* 695 N.W.2d 109, 119 (Minn.2005) (citing *State v. Asfeld,* 662 N.W.2d 534, 542 (Minn.2003)).[3]

### A.

We have held that a defendant's participation in a *Spreigl* incident may be considered clear and convincing when it is highly probable that the facts sought to be admitted are truthful. *Kennedy,* 585 N.W.2d at 389. We review a district court's decision only for an abuse of discretion. *State v. DeWald,* 464 N.W.2d 500, 503 (Minn.1991). Here, the record reveals that Caron was frequently in the principal's office at Washington Elementary School to be disciplined for his behavior. Later, when Caron entered a substance abuse treatment program when he was 25 years old, he made his first disclosure about the incidents between him and Ness. When Caron was asked to testify at trial, he drove over 1,500 miles to testify and faced the possibility of losing his employment because of his absence. The district court determined that Caron's testimony was credible and accordingly concluded that Ness's participation in the incidents involving Caron was clear and convincing. The court's de-

terminations on this point were within its discretion.

### B.

■ The district court should not simply take the prosecution's stated purposes for the admission of other-acts evidence at face value. Instead, the court "should follow the clear wording of Rule 404(b) and look to the real purpose for which the evidence is offered," and ensure that that purpose is one of the permitted exceptions to the rule's general exclusion of other-acts evidence. *State v. Frisinger,* 484 N.W.2d 27, 32 (Minn.1992). Only *after* such an examination is completed should the court balance the probative value of the evidence against its potential to be unfairly prejudicial.

■ In assessing the probative value and need for the evidence, the district court "must identify the precise disputed fact to which the *Spreigl* evidence would be relevant." *Angus v. State,* 695 N.W.2d at 120 (citing *State v. Bolte,* 530 N.W.2d at 197). This entails isolating the consequential fact for which the evidence is offered, and then determining the relationship of the offered evidence to that fact and the relationship of the consequential fact to the disputed issues in the case. 11 Peter N. Thompson, *Minnesota Practice—Evidence* § 404.06 at 162 (3d ed.2001); *see* Minn. R. Evid. 401 (defining "relevant evidence" as evidence tending to make more or less probable the existence of any "fact that is of consequence" to the determination of the action).

In this case, the state argued for admission of the Caron evidence on the grounds

---

**2.** Most of the *Spreigl* cases use the term other-crimes evidence, but Minn. R. Evid. 404(b) pertains to "other crimes, wrongs, or acts"— and no distinction is made, for purposes of this rule, among the three in Minnesota case law.

**3.** As we noted in *Angus,* the notice requirement has been incorporated into Minn. R.Crim. P. 7.02, and the clear and convincing evidence standard for criminal prosecutions is in the text of Minn. R. Evid. 404(b). *Angus,* 695 N.W.2d at 119 n. 4.

that it would show motive, intent, lack of mistake or accident, and common scheme or plan.

 The contention that the evidence was needed to show motive is the most easily dismissed. Motive is not an element of most crimes, but the state is usually entitled to prove motive because "motive explains the reason for an act and can be important to a required state of mind." 8 Henry W. McCarr & Jack S. Nordby, *Minnesota Practice—Criminal Law and Procedure* § 32.19 at 451 (3d ed.2001) (hereinafter McCarr & Nordby). Here, the state maintained that Caron's testimony supported the argument that sexual gratification was Ness's motive for touching E.M. But motive concerns external facts that create a desire in someone to do something, whereas intent is a state of mind in which an act is done consciously, with purpose. *See id.;* Minn.Stat. § 609.02, subd. 9(3) (2004) (defining criminal intent). *See also, e.g., State v. Black,* 291 N.W.2d 208, 215 (Minn.1980) (upholding admission of *Spreigl* evidence to show that motive for murder was to silence witness on outstanding robbery charges against defendant); *State v. Ferguson,* 581 N.W.2d 824, 834 (Minn.1998) (allowing *Spreigl* evidence to show that gang affiliation was motive for murder). The state conflated the issues of motive, which is not an element of second-degree criminal sexual conduct, and intent, which is. *See* Minn. Stat. § 609.341, subd. 11 (2004) (defining "sexual contact" as acts "committed with sexual or aggressive intent").

 Other-acts evidence may help to prove the element of intent, *State v. Hannuksela,* 452 N.W.2d 668, 679 (Minn.

1990), but the admission of such evidence under this exception requires an analysis of the kind of intent required and the extent to which it is a disputed issue in the case. *See* 8 McCarr & Nordby § 32.19 at 452. In the present case, the real issue was not Ness's intent, but whether or not Ness touched E.M.'s intimate parts. Ness testified that he only touched E.M. on the back and the leg, and that he had no sexual intent when he did so. He denied touching E.M.'s intimate parts. *See* Minn. Stat. § 609.341, subd. 5 (2004) (defining intimate parts to include primary genital area, groin, inner thigh, buttocks, or breast). In cases such as this one, sexual or aggressive intent can readily be inferred from the contacts themselves; here, there could be no other reason for Ness to touch E.M.'s intimate parts.[4] We conclude that the proffered Caron evidence was marginally admissible at best on the issue of intent. In light of Ness's denial that he touched E.M.'s intimate parts, we also conclude that the evidence was not admissible to show absence of mistake or accident. Ness specifically argued that E.M. must have misperceived his intent in touching E.M.'s back and legs.

The use of *Spreigl* evidence to show a common scheme or plan has been endorsed repeatedly, despite the particular risk it poses for unfair prejudice. This exception was "originally reserved for those offenses which could be described as preplanned steps in a larger scheme of which the charged offense was another step." *State v. Forsman,* 260 N.W.2d 160, 166 (Minn.1977) (citing cases). The exception evolved, however, "to embrace evidence of offenses which, because of their

---

4. In *State v. Wermerskirchen,* we quoted with approval the statement by Professor Wright that in child molestation cases, "[t]he intent of the defendant is usually readily inferable from the doing of the act—once one is convinced that the act took place." 497 N.W.2d at 240 n. 2 (quoting 22 Charles Alan Wright & Kenneth W. Graham, Jr., *Federal Practice & Procedure—Evidence* § 5239 at 461–62 (1978)).

marked similarity in modus operandi to the charged offense, tend to corroborate evidence of the latter." *Id.* In *State v. Kennedy,* we made clear that the common-scheme exception is not limited to instances in which identity is at issue. 585 N.W.2d at 391. In *State v. Wermerskirchen,* we held that other-acts evidence is admissible under this exception to establish that the conduct on which the charged offense was based actually occurred or to refute the defendant's contention that the victim's testimony was a fabrication or a mistake in perception. 497 N.W.2d at 241–42.

■ The common scheme or plan exception may have been applied more broadly than it should be. We have frequently said that the closer the relationship between the other acts and the charged offense, in terms of time, place, or modus operandi, the greater the relevance and probative value of the other-acts evidence and the lesser the likelihood that the evidence will be used for an improper purpose. *Kennedy,* 585 N.W.2d at 390; *Bolte,* 530 N.W.2d at 198; *Wermerskirchen,* 497 N.W.2d at 240; *Frisinger,* 484 N.W.2d at 31. In *Kennedy,* we stated the general rule that: "*Spreigl* evidence need not be identical in every way to the charged crime, but must instead be sufficiently or *substantially similar* to the charged offense—determined by time, place and modus operandi." 585 N.W.2d at 391 (emphasis added). Our cases make clear, however, that the common scheme or plan exception includes evidence only of offenses that have a "*marked similarity* in modus operandi to the charged offense." *Forsman,* 260 N.W.2d at 166 (emphasis added); *State v. Norris,* 428 N.W.2d 61, 69

(Minn.1988); *see also Ture v. State,* 681 N.W.2d 9, 18 (Minn.2004). We take this opportunity to clarify that in determining whether a bad act is admissible under the common scheme or plan exception, it must have a marked similarity in modus operandi to the charged offense.

■ Ultimately, the only legitimate reason for the admission of Caron's testimony was under this exception, to prove that Ness touched E.M.'s intimate parts or, stated another way, to bolster E.M.'s credibility by showing that he was not fabricating. But, the state's case was particularly strong on this issue. The district court found E.M.'s testimony to be "very credible," based on his ability to answer questions on a difficult subject directly, with consistency, and without hesitation. Valerie Voigt's remarkable corroborative testimony significantly supported E.M.'s account, and the district court found her testimony "credible in and of itself." The state's case was strong overall and especially so with regard to dispelling any sense that E.M. fabricated the incident with Ness.

C.

■ We next turn to the question of whether the Caron incidents, which occurred 35 years before the charged offense, were too remote in time to be relevant or probative.[5] Recently, in *State v. Washington,* we declined to adopt a bright-line rule for determining when a prior bad act has lost its relevance on the basis of remoteness. 693 N.W.2d at 201. "Instead, 'the preferred approach is for the trial court to focus on the closeness of the relationship between the other crimes and the charged crimes in terms of time,

---

**5.** We have said that "[t]he degree of proximity between the prior and charged acts, while bearing somewhat on the probative value analysis, is largely a factor in determining whether the *Spreigl* evidence is relevant to the prosecution." *State v. Washington,* 693 N.W.2d at 201.

place and modus operandi.'" *Id.* (quoting *State v. Frisinger*, 484 N.W.2d at 31).

 In *Washington,* we surveyed cases involving time gaps of up to 19 years between the prior acts and the charged act—the greatest gap in time we have heretofore considered. *Id.* at 201–02. We concluded:

> [A] district court, when confronted with an arguably stale *Spreigl* incident, should employ a balancing process as to time, place, and modus operandi: the more distant the *Spreigl* act is in terms of time, the greater the similarities as to place and modus operandi must be to retain relevance.

*Id.* at 202. Our cases show that relevancy concerns about bad acts that are remote in time are lessened if (1) the defendant spent a significant part of that time incarcerated and was thus incapacitated from committing crimes; (2) there are intervening acts that show a repeating or ongoing pattern of very similar conduct; or (3) the defendant was actually convicted of a crime based on the prior bad act, thus reducing the prejudice of having to defend against claims of acts that occurred years before. *Id.* at 202–03; *State v. Wermerskirchen*, 497 N.W.2d at 242 & n. 3; *State v. Rainer*, 411 N.W.2d 490, 497 (Minn. 1987); *State v. Filippi*, 335 N.W.2d 739, 743–44 (Minn.1983).

 Applying the balancing test enunciated in *Washington,* we conclude that the Caron incidents were too remote in time to retain relevance and probative value. They occurred 35 years before the charged offense, far beyond the time gap in any case where we have upheld the admission of other-acts evidence. The conduct involved in the Caron incidents is not markedly similar in modus operandi to that involved in the charged offense, as is required for other-acts evidence to be admissible under the common scheme or plan

exception. *State v. Forsman,* 260 N.W.2d at 166. Further, there is no evidence of intervening acts to show a pattern of sexual misconduct with children, and Ness was not incarcerated during any of the intervening 35 years. We therefore hold that the admission of the Caron evidence was error.

### D.

 We further conclude that the probative value of the Caron evidence was outweighed by its potential for unfair prejudice. We reach this conclusion for two reasons. First, because the evidence was not relevant, the inherently prejudicial nature of additional allegations of child sexual abuse could only have worked to Ness's prejudice. Second, the Caron evidence was not needed to strengthen otherwise weak or inadequate proof of an element of the charged offense or the state's case as a whole.

Before discussing the second reason, we wish to refine our jurisprudence concerning assessment of the prosecution's need for *Spreigl* evidence. We believe the time has come to dispense with an independent necessity requirement for the admission of *Spreigl* evidence and adopt the approach we have suggested in other cases. The focus on the relative strength of the prosecution's case, instead of the probative value of other-crimes evidence, highlights the irony inherent in admitting intrinsically prejudicial evidence only when it is most needed to convict.

The court first announced a necessity requirement of admissibility under the identity exception in *State v. Billstrom:* "Evidence of other crimes is admissible only if the trial court finds the direct or circumstantial evidence of defendant's identity is otherwise weak or inadequate, and that it is necessary to support the

state's burden of proof." 276 Minn. at 178–79, 149 N.W.2d at 284 (footnote omitted). The court later expanded this requirement to other exceptions under which *Spreigl* evidence may be admitted. *State v. Stagg*, 342 N.W.2d 124, 127 (Minn.1984) ("Regardless of the purpose for which the evidence is admitted, * * * the direct or circumstantial evidence on the issue must be weak or inadequate."). The court's jurisprudence on this point subsequently developed into two rules, a weak-issue rule in cases in which identity is in issue, and a weak-case rule when *Spreigl* evidence is offered for some other purpose. *State v. Kennedy*, 585 N.W.2d at 392 (citing *State v. DeWald*, 464 N.W.2d at 504, and *State v. Slowinski*, 450 N.W.2d 107, 114 (Minn. 1990)).

Most commentators agree that the need for the evidence is among a number of factors, perhaps even the major factor, to be considered in deciding whether the danger of unfair prejudice outweighs the probative value of other-acts evidence. *See, e.g.*, 1 *McCormick on Evidence* § 190 at 672–73 (5th John W. Strong ed.1999) (stating that need for evidence and efficacy of alternative proof are among a variety of factors); 1 Christopher B. Mueller & Laird C. Kirkpatrick, *Federal Evidence* § 108 at 603 (2d ed.1994) ("major factor" in assessing prejudice is prosecution's need for the evidence, which itself is affected by a number of variables). Our court explained what necessity means in *State v. Bolte:*

> "Need" for other-crime evidence is not necessarily the absence of sufficient other evidence to convict, nor does exclusion necessarily follow from the conclusion that the case is sufficient to go to the jury. A case may be sufficient to go to the jury and yet the evidence of other offenses may be needed because, as a practical matter, it is not clear that the

jury will believe the state's other evidence bearing on the disputed issue.

530 N.W.2d at 197 n. 2, *quoted in Angus*, 695 N.W.2d at 120. It is precisely because the district court would have to be fairly confident that the state's other evidence was strong enough to convince a jury beyond a reasonable doubt before excluding *Spreigl* evidence that courts should not have to rely on the need factor as an independent requirement of admissibility. *See* 22 Charles Alan Wright & Kenneth W. Graham, Jr., *Federal Practice & Procedure—Evidence* § 5250 at 547 (1978).

■ This case demonstrates the need for the district court to conduct a thoroughgoing examination of the purposes for which *Spreigl* evidence is offered, and to weigh the probative value of the evidence on disputed issues in the case against its potential for unfair prejudice. The prosecution's need for other-acts evidence should be addressed in balancing probative value against potential prejudice, not as an independent necessity requirement, which has become a shibboleth. Henceforth, courts should address the need for *Spreigl* evidence in the context of balancing the probative value of the evidence against its potential for unfair prejudice. *See Angus v. State*, 695 N.W.2d at 119–20 (citing cases); *State v. Kennedy*, 585 N.W.2d at 391–92 (quoting *State v. Berry*, 484 N.W.2d 14, 17 (Minn.1992)); *State v. Bolte*, 530 N.W.2d at 197 n. 2 (citing *State v. DeWald*, 464 N.W.2d at 504).

In the present case, Caron's testimony was allowed, in part, because the state had a weak case. But the state's case was not weak on the real issue for which the evidence was offered. The state had a firsthand witness—an uncommon source of testimony in a case involving the sexual abuse of a young person—who substantiated E.M.'s testimony that Ness touched his intimate parts. The district court heard

this testimony before deciding whether to admit the Caron evidence, as is the preferred approach, and it expressly determined that both E.M. and Voigt were credible witnesses. Thus, this is a case where the probative value of the other-acts evidence was low and the potential for the evidence to persuade by improper means was high. On these facts, we conclude that the other-acts evidence was erroneously admitted.

## IV.

When the district court has erroneously admitted other-acts evidence, this court must determine whether there is a reasonable possibility that the wrongfully admitted evidence significantly affected the verdict. *State v. Bolte,* 530 N.W.2d at 198 (quoting *State v. Post,* 512 N.W.2d 99, 102 n. 2 (Minn.1994)). The district court stated that Caron's testimony "bolstered" its determination that Ness acted with sexual or aggressive intent. In contrast to the dissent, we believe that the court acknowledged the potential for unfair prejudice and carefully structured its findings to show that the Caron evidence was not the critical push beyond a reasonable doubt. The Caron testimony is not of such weight as to tip the balance toward reversal for two reasons. First, in its memorandum the court stated plainly that it based its finding that intent had been proven beyond a reasonable doubt on the testimony of two witnesses—E.M., whom it found "very credible," and Valerie Voigt, whose testimony it found "credible in and of itself." Second, the court concluded that with the credible testimony of E.M. and Voigt, Ness's actions were enough on their own to show beyond a reasonable doubt that he acted with sexual or aggressive intent.

Without real and discernible prejudice, we cannot conclude that the admission of the *Spreigl* testimony in this case significantly affected the verdict. Accordingly, we affirm Ness's conviction.

Affirmed.

PAGE, Justice (dissenting).

I respectfully dissent. In my view, the error in admitting stale allegations of child sexual abuse into Ness's trial is reversible error. I also write separately to address the relevance of prior bad acts that are remote in time from the charged offense, and the court of appeals' reading of our decision in *State v. Wermerskirchen,* 497 N.W.2d 235 (Minn.1993).

## I.

The district court did not make a specific finding as to whether the Caron evidence was relevant and the court of appeals, relying on *Wermerskirchen,* concluded that it was.

In *Wermerskirchen,* the defendant was charged with sexually abusing his nine-year-old daughter four years before the trial. *Id.* at 238. At trial, *Spreigl* evidence of the defendant's sexual abuse of his stepdaughter, J.L., and two of his nieces, C.S. and J.R., was admitted. Some of the incidents involving the sexual abuse of J.L. occurred as many as nine years before the defendant's trial. The incidents involving J.R. occurred over a period of time between 9 and 17 years before the trial. And the incidents of abuse involving C.S. occurred as many as 19 years before the trial. *Id.* at 237. Significantly, in footnote 3 of *Wermerskirchen* we said:

Often the passage of time, while superficially significant, turns out to be without real significance * * * if it turns out that the defendant was in prison in the interval between the prior offense and the current offense and was incapacitated from committing crime [or] if the older offense is part of a "pattern" of

similar misconduct occurring over a number of years.

*Id.* at 242 n. 3. We held that the *Spreigl* evidence relating to J.L., J.R., and C.S. was properly admitted at trial because it was part of a pattern of sexual abuse by the defendant. *Id.* at 242–43.

Beyond *Wermerskirchen,* we have, in a number of other cases, upheld the admission of evidence of other crimes, wrongs, or acts that occurred years before the charged crime.[1] Those cases are consistent with what we said in *Wermerskirchen* in that the evidence admitted was part of a pattern of conduct by the defendant and/or the defendant was in jail or otherwise incapacitated from engaging in similar conduct during the intervening years.[2] Recently, in *State v. Washington,* we held that the district court did not abuse its discretion when it admitted evidence of sexual abuse that occurred 16 years before the last sexual abuse of the complainant. *State v. Washington,* 693 N.W.2d 195, 200 (Minn. 2005). We explained in *Washington* that our cases, including *Wermerskirchen,* show that:

> [A] district court, when confronted with an arguably stale *Spreigl* incident, should employ a balancing process as to time, place, and modus operandi: the more distant the *Spreigl* act is in terms of time, the greater the similarities as to place and modus operandi must be to retain relevance. They also show that concerns about acts that are remote in time are lessened where the defendant spent a significant part of that time incarcerated and other intervening acts

tend to bolster the prior act's relevance and materiality. Such concerns are also lessened if the defendant was actually convicted of a crime based on the prior bad acts because the process of securing a conviction (i.e., obtaining a defendant's plea of guilty or gathering and presenting evidence at a trial) reduces the actual prejudice to the defendant of being required to defend against claims concerning acts that occurred years ago.

*Id.* at 202. We also noted that, "[i]n general, the prior acts become less relevant as time passes. Thus, the greater the time gap, the more similar the acts must be to lessen the likelihood that the *Spreigl* evidence will be used for an improper purpose." *Id.* at 201 (internal quotations and citations omitted). In *Washington,* we affirmed the district court's admission of the *Spreigl* evidence because, while there were no acts of sexual misconduct during the intervening years, the defendant had been convicted of the *Spreigl* incident, had been incarcerated for over half of that time period, and the *Spreigl* incidents were "strikingly similar in modus operandi to the charged acts." *Id.* at 202–03.

In relying on our decision in *Wermerskirchen,* the court of appeals characterized it as a case in which this court admitted 19–year–old *Spreigl* evidence "to establish a pattern of improper sexual conduct." *State v. Ness,* No. A03–1187, 2004 WL 1444952 at \*2 (Minn.App. June 29, 2004). That characterization is correct as far as it goes. Unfortunately, the court of appeals, in analyzing the present

---

1. See *State v. Crocker,* 409 N.W.2d 840 (Minn. 1987) (nine-year-old offense was relevant and material because defendant was in prison during the nine-year interval); *State v. Filippi,* 335 N.W.2d 739 (Minn.1983) (*Spreigl* evidence of defendant's participation in a similar crime four years earlier was relevant and material to the charged offense because de-

fendant was in prison for most of the four-year period); *State v. Bolts,* 288 N.W.2d 718 (Minn.1980) (*Spreigl* evidence was admissible when defendant was in prison during the four-year interval between the charged offense and prior crime evidence).

2. See *infra* note 3.

case, did not go beyond that characterization. In *Wermerskirchen* we explained that under two circumstances the significance of the passage of time is diminished: (1) when the defendant was in prison or otherwise incapacitated for all or a portion of the interval between the occurrence of the *Spreigl* incident and the charged offense; and (2) when "the older offense is part of a pattern of similar misconduct occurring over a number of years." 497 N.W.2d at 242 n. 3 (citations omitted). Interestingly, the court of appeals' decision did not quote that portion of footnote 3 of *Wermerskirchen* that discussed the significance of the *Spreigl* incident being a part of a pattern or the effect of incarceration or other incapacity on the passage of time.[3] It is interesting

3. That footnote in its entirety reads:

Defendant complains about the lack of closeness in time between the charged offense and the other crimes. *We have never held that there must be a close temporal relationship between the charged offense and the other crime.* In State v. Filippi, 335 N.W.2d 739, 743 (Minn.1983), *we said, "In determining relevancy, we have generally required that the other crime be similar in some way—either in time, location, or modus operandi—to the charged offense, although 'this' [sic] of course, is not an absolute necessity." Often the passage of time, while superficially significant, turns out to be without real significance.* Thus, e.g., the passage of a number of years may be without real significance if it turns out that the defendant was in prison in the interval between the prior offense and the current offense and was incapacitated from committing crime. *See State v. Filippi,* 335 N.W.2d 739, 743–44 (Minn.1983), and cases cited therein. Also, the passage of a number of years may be without real significance if the older offense is part of a "pattern" of similar misconduct occurring over a number of years. *State v. Anderson,* 275 N.W.2d 554 (Minn.1978). An illustrative case is *State v. Crocker,* 409 N.W.2d 840 (Minn.1987), where, in the prosecution of the defendant for raping a college student, we upheld the admission of evidence that 9 years earlier, in 1977, the defendant had sexually assaulted a 7–year–old girl. We said:

The fact that defendant committed a sex offense in 1977, was in prison for most of the next 9 years, and then in 1986 committed two sex offenses before the current offense shows a relevant pattern of sexually assaultive conduct. The fact that the 1977 offense involved the sexual assault of a 7–year–old girl rather than a woman or a sexually mature young woman should not necessarily make a difference. * * * The 1977 offense in question involved the opportunistic sexual assault of a vulnerable 7–year–old girl during a brief period of time when defendant was alone with her. The January 1986 offense involved the opportunistic attempt to assault a vulnerable 15–year–old stepdaughter sexually during a brief period of time when the girl's mother went to the grocery store on a quick errand. The assault on [a friend of the complainant shortly before the defendant raped the complainant] was a similar opportunistic assault on a young woman who was in a temporarily vulnerable position. The charged offense occurred under similar circumstances.

409 N.W.2d at 843. *See also State v. Rainer,* 411 N.W.2d 490 (Minn.1987), where we upheld the admission of evidence of 16 to 19–year–old incidents which showed a repeating pattern of very similar conduct. *The ultimate issue is not the temporal relationship but relevance. "Older" offenses sometimes are relevant, sometimes not. Relevance generally must be determined by the trial court, with review limited to whether the trial court abused its discretion.*

The other crimes here occurred between 1970 and 1982, whereas the current offense occurred in 1989. The trial court concluded that this time lapse did not require exclusion because, as the trial court put it, "The other *Spreigl* factors allow for the admission of this evidence." Specifically, the trial court said:

In each case the incidents have a similar modus operandi on the part of the Defendant, i.e., rubbing buttocks and touching breasts. The incidents also have a similarity in location, i.e., in or at the home of the alleged victim. The incidents involved * * * inappropriate sexual contact with young female relatives of the ages of 10 to 13 years of age, and the victims

because in its decision the court of appeals did not analyze whether the Caron evidence was part of a pattern of sexual abuse or whether there was some incapacity that made the passage of time lose its significance. Indeed, a fair reading of the court of appeals' decision in *Ness* suggests that the court read *Wermerskirchen* as creating a bright-line rule that in sexual abuse cases *Spreigl* evidence will always have real significance, no matter how much time passed between the other occurrence and the charged offense. We did not, however, create a bright-line rule. Nothing in *Wermerskirchen* indicates that the passage of time does not have real significance when the gap in time between the charged offense and the *Spreigl* incident is great and there is no pattern of sexual misconduct during the intervening years, and the defendant was not in prison or otherwise incapacitated from engaging in sexual misconduct. Thus, courts must examine the facts of each case to determine the significance, if any, of the passage of time.

The facts of this case are distinguishable from *Wermerskirchen, Washington,* and the other cases in which we have upheld the admission of *Spreigl* evidence in the face of a claim that the passage of time made that evidence lose its relevance. None of those cases involved other crimes, wrongs, or acts that occurred three decades before the charged offense. More importantly, here, during the 35 years in question, Ness was an elementary school teacher, a principal, and a volunteer art instructor who had constant contact with children. Yet the record does not contain any evidence indicating that during that time Ness either engaged in or was alleged to have engaged in any sexual misconduct with children. Thus, the record does not indicate any pattern of sexual misconduct during that time period despite Ness's continued exposure to children. Nor is there any evidence that Ness was incapacitated from engaging in sexual misconduct during that period of time. If anything, the record suggests that Ness was in a position to engage in such misconduct but did not. Thus, in this case, I conclude that the passage of time has real significance in that the incidents admitted as *Spreigl* evidence were stale and too old to be relevant.

## II.

A defendant is entitled to a new trial when the district court erroneously admits *Spreigl* evidence if "there is a reasonable possibility that the wrongfully admitted evidence significantly affected the verdict." *State v. Bolte,* 530 N.W.2d 191, 198 (Minn. 1995); *see also State v. Post,* 512 N.W.2d 99, 102 n. 2 (Minn.1994). In cases tried to a judge, I presume that the judge knows the law and restricts evidence of limited admissibility to its proper scope and purpose. *See* Minn. R. Evid. 105. Therefore, I presume that in admitting the *Spreigl* evidence involving Caron, the district court did not use it for an improper purpose. Even making this presumption, it must still be determined whether there is a reasonable possibility that the use of the improperly admitted evidence "significantly" affected the verdict. According to the district court, the main issue in the case was

were all pre-adolescents at some point in the alleged encounters.

The victim in this case was also a pre-adolescent being approximately 8 years and 3 months old at the time of the alleged incidents in April, 1989. The type of conduct, the location of the conduct and the youth of the victims is similar to the crime charged. Further, the sexual intent of the incidents is clear.

*Wermerskirchen,* 497 N.W.2d at 242 n. 3 (emphasis added). The italicized portion of the footnote was quoted in the court of appeals' *Ness* opinion.

whether Ness touched E.M. with sexual or aggressive intent. In the court's memorandum of law it found that the testimony offered by E.M. about the incident was "very credible." The court also found that Voigt's testimony about the incident was consistent with E.M.'s testimony, added credibility to E.M.'s testimony, and was "credible in and of itself."

Based on that testimony, the district court found that "[Ness]'s actions * * *, along with the nature and number of times he touched E.M.'s intimate parts, is by itself sufficient to show beyond a reasonable doubt that [Ness] acted with sexual or aggressive intent." Notwithstanding that finding, the district court specifically indicated that the *Spreigl* evidence involving Caron "bolstered" its finding that Ness touched E.M. with sexual or aggressive intent. Given this statement by the district court, I conclude that there is a reasonable possibility that the wrongfully admitted Caron evidence significantly affected the verdict. Had the evidence not had a significant effect on the verdict, there would have been no reason, given the district court's other findings, to have noted that the Caron evidence bolstered its findings on intent.

Even if there arguably was not a reasonable possibility that the verdict was affected by the Caron evidence, I believe we should nevertheless reverse in the exercise of our supervisory powers. We should do so to make clear that district courts may not admit irrelevant, inherently prejudicial evidence of this nature.

I would therefore reverse the court of appeals and remand for a new trial.