*This opinion will be unpublished and
may not be cited except as provided by
Minn. Stat. § 480A.08, subd. 3 (2014).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A14-1026**

State of Minnesota,
Respondent,

vs.

Brian Lee Hendrickson,
Appellant.

**Filed May 4, 2015
Affirmed
Hooten, Judge**

Grant County District Court
File No. 26-CR-11-328

Lori Swanson, Attorney General, St. Paul, Minnesota; and

Justin R. Anderson, Grant County Attorney, Elbow Lake, Minnesota (for respondent)

Cathryn Middlebrook, Chief Appellate Public Defender, Julie Loftus Nelson, Assistant
Public Defender, St. Paul, Minnesota (for appellant)

Considered and decided by Stauber, Presiding Judge; Schellhas, Judge; and
Hooten, Judge.

**U N P U B L I S H E D   O P I N I O N**

**HOOTEN**, Judge

On appeal from his conviction of first-degree arson, appellant argues that the
evidence was insufficient to sustain his conviction. We affirm.

## FACTS

On May 14, 2011, a fire extensively damaged a home in Herman, Minnesota. Appellant Brian Lee Hendrickson was charged with first-degree arson in connection with the fire. Hendrickson waived his right to a jury trial, and the district court held a two-day bench trial in October 2013. The following facts were adduced at trial.

Hendrickson met M.H., the owner of the home in question, while they were both participating in a chemical dependency treatment program in St. Cloud. The two became friends and later became romantically involved. Soon after they met, M.H. suffered a stroke and Hendrickson moved to Herman so that he could assist M.H. in her recovery. Although they initially lived together, Hendrickson obtained an apartment of his own when M.H. recovered from her stroke and became more self-sufficient. The apartment was located on the same block and had a view of M.H.'s home from its porch, but Hendrickson continued to primarily spend time at M.H.'s home.

According to M.H., by early May 2011, her romantic relationship with Hendrickson had become a "mess" and had "run its course." However, M.H. still trusted Hendrickson and asked him to take care of the home and her cat, Chipper, while she traveled to France with her sister for a few weeks. M.H. spoke with Hendrickson on the telephone twice while she was away, and during the second telephone call on May 11, Hendrickson told her not to call again until May 14. M.H. was concerned that Hendrickson had been drinking when she talked with him on May 11, and Hendrickson did not answer the phone when she subsequently called him two more times between May 11 and May 14.

M.H.'s neighbors testified that they each knew that M.H. was on vacation just before the fire occurred and saw only Hendrickson occupying the house while M.H. was absent. They testified that the house had several large windows and that they could easily see inside the house when the blinds were open. At night, they observed Hendrickson watching the television in the house. On the day of the fire, one of the neighbors saw M.H.'s vehicle leave the house around 10:30 or 11:00 a.m. and later return. She assumed Hendrickson had driven the vehicle, as M.H. was on vacation and she had never seen anyone other than Hendrickson or M.H. drive the car. However, she did not see Hendrickson reenter the house when the vehicle returned.

The neighbors also noticed several peculiarities about the home on that day. They saw that the blinds were closed, something that none of them had previously witnessed. Another neighbor noticed that around 1:00 p.m., Hendrickson was standing in the rain on the porch of his apartment, in view of M.H.'s house. Around 1:45 p.m., two of the neighbors discovered Chipper at their back door, soaking wet from the rain and in an agitated state. They found it unusual that the cat would be outside on a rainy day, and testified that Chipper had no way to leave the house on his own. M.H. and Hendrickson both testified that they typically would not leave Chipper outside when leaving for the day.

After giving Chipper some treats, one of the neighbors went to M.H.'s home to return Chipper. When he opened the front door of M.H.'s home, he encountered smoke. He immediately left and attempted to contact emergency services, but his telephone was not working and a firefighter who lived nearby was not at home. He then went to

Hendrickson's apartment and found Hendrickson lying on the bed. He told Hendrickson that M.H.'s home was on fire. Hendrickson responded by saying something that the neighbor was unable to understand, and he did not get up from his bed.

Firefighters were eventually dispatched to the home at 3:47 p.m. The firefighters encountered Hendrickson at the scene when they arrived. Before entering the home, one of the firefighters questioned Hendrickson about the fire. Hendrickson informed the firefighter that he was inside the residence when the fire started and that it had started in the basement. The firefighter then had to prevent Hendrickson from entering the residence. One of the firefighters and a sheriff's deputy both testified that Hendrickson told them, as firefighters were battling the fire, to "[j]ust let it burn" because M.H. "has a lot of money."

The sheriff's deputy believed that Hendrickson was intoxicated because he smelled alcohol on his breath and heard Hendrickson using vulgar language with emergency personnel. Hendrickson refused to submit to a preliminary breath test at the scene, and he was subsequently arrested because he was on probation and was restricted from using alcohol. At a police interview following his arrest, Hendrickson continued to refuse to submit to a preliminary breath test. However, he acknowledged to the sheriff's deputy that he was intoxicated and admitted to consuming a half-gallon or more of whiskey daily for the last three weeks. Hendrickson also told the sheriff's deputy that he "knew there was trouble" at M.H.'s house after hearing sirens and therefore "tried to get into the base, into the house and the basement and . . . couldn't get in."

After the fire had subsided, Deputy Fire Marshall John Steinbach arrived on the scene around 6:30 p.m. and conducted an investigation. He testified that the home's exterior and much of its first floor sustained only smoke damage and did not contain charring that could help him pinpoint the fire's source. The only room on the main floor with significant charring was a spare bedroom. This bedroom had a hole burnt through the floor, which led Steinbach to believe that the fire had started in the basement.

In investigating the home's basement, Steinbach excluded accidental causes for the fire, such as appliances, the home's electrical wiring, or the basement furnace. An examination of the burn patterns below the hole in the first floor led Steinbach to pinpoint a partially burned trashcan containing wood pieces as the origin of the fire. He also noted "arc vaulting" in the electrical wiring above the trashcan. Steinbach explained that arc vaulting consists of the marks in electrical wiring that are left behind where a fire first encounters energized wiring in the home, and that these marks therefore indicate that the fire began nearby. Due to his elimination of accidental sources of ignition, Steinbach concluded that the fire was "intentionally set to cause property damage," likely with an open flame from matches or a cigarette lighter being applied to the wood in the trashcan.

Hendrickson testified in his own defense at trial. He detailed his longtime struggles with alcohol abuse, as well as his relationship with M.H. Hendrickson claimed that, on the day of the fire, he had a couple drinks in the morning, took M.H.'s car to a gas station for cigarettes and a newspaper, and then went to his apartment to have a couple more drinks, do some chores, watch television, and take a nap. He then went to M.H.'s home after being awoken by the neighbor. He disputed much of the state's

5

evidence: he claimed that he told rescue personnel, "*Don't* let it burn," that he was not excessively intoxicated at the scene, that he and M.H. routinely closed the home's blinds, and that it was not unusual for the cat to be outside that day. Finally, he asserted that he did not set the home on fire.

The district court found Hendrickson guilty of first-degree arson. In its order, the district court detailed the trial testimony and found that Hendrickson's testimony lacked credibility. It concluded that the accidental-ignition theory propounded by Hendrickson was unsupported and specifically contradicted by the evidence. Based on the expert testimony as to the fire's origin, the witnesses' testimony as to Hendrickson's deviation from his normal routine, and Hendrickson's statements at the scene and to police, the district court concluded beyond a reasonable doubt that Hendrickson intentionally set fire to M.H.'s home. The district court sentenced Hendrickson to 48 months in prison. This appeal followed.

## DECISION

Hendrickson argues that the circumstantial evidence produced at trial was insufficient to support his conviction of first-degree arson. The statute provides that "[w]hoever unlawfully by means of fire or explosives, intentionally destroys or damages" a dwelling commits first-degree arson. Minn. Stat. § 609.561, subd. 1 (2010). Hendrickson disputes the sufficiency of the evidence introduced to prove two of the crime's elements: (1) that he caused the fire; and (2) that he intended to destroy or damage the home. *See id.*

While a bench trial was held in this case, this court "use[s] the same standard of review in bench trials and in jury trials in evaluating the sufficiency of the evidence." *State v. Palmer*, 803 N.W.2d 727, 733 (Minn. 2011). The parties do not dispute that the evidence in support of Hendrickson's conviction on these two elements is wholly circumstantial, which is common for arson prosecutions. *See State v. Battin*, 474 N.W.2d 427, 430 (Minn. App. 1991), *review denied* (Minn. Oct. 23, 1991). We apply a two-step analysis when reviewing the sufficiency of circumstantial evidence: (1) we identify the circumstances proved; and (2) we then "determine whether the circumstances proved are consistent with guilt and inconsistent with any rational hypothesis except that of guilt." *State v. Silvernail*, 831 N.W.2d 594, 598–99 (Minn. 2013) (quotations omitted).

We first examine what circumstances were proved at trial. "In identifying the circumstances proved, we defer, consistent with our standard of review, to the [factfinder's] acceptance of the proof of these circumstances and rejection of evidence in the record that conflicted with the circumstances proved by the [s]tate." *State v. Al-Naseer*, 788 N.W.2d 469, 473 (Minn. 2010) (quotations omitted). In short, "we consider only those circumstances that are consistent with the verdict." *Silvernail*, 831 N.W.2d at 599. We give such deference to the factfinder because it is in the best position to determine credibility and weigh the evidence. *See Al-Naseer*, 788 N.W.2d at 473.

In light of this standard, the circumstances proved at trial are: (1) Hendrickson lived off and on with M.H. for the last six years, but there was recent friction in the relationship and he and M.H. had discussed different living arrangements; (2) in their phone call on May 11, Hendrickson told M.H. not to call again until May 14, the day of

7

the fire; (3) M.H. left Hendrickson in charge of her home while she was on vacation, and he was the only person in Herman authorized to be in her home and who was seen at the home while M.H. was away; (4) on the morning of the fire, Hendrickson closed the blinds and left Chipper outside before leaving the house and spending the day in his apartment; (5) Hendrickson was seen on his apartment's porch around 1:00 p.m.; (6) when first informed of the fire at M.H.'s home, Hendrickson did not leave his bed; (7) Hendrickson was present when firefighters arrived at M.H.'s home and had to be prevented from entering the home; (8) before emergency personnel entered the home, Hendrickson told firefighters that the fire had originated in the basement; (9) Hendrickson told emergency personnel at the scene to "[j]ust let it burn;" (10) Hendrickson was observed to be intoxicated at the scene, told police that he was intoxicated, and indicated that he had recently been drinking heavily; and (11) Deputy Fire Marshall Steinbach concluded that the fire was intentionally started in the basement trashcan.

Next, we determine whether these circumstances proved are both consistent with guilt and *inconsistent* with any rational hypothesis except that of guilt. *Silvernail*, 831 N.W.2d at 599. We give no deference to the factfinder here; rather, we independently decide whether the circumstances proved "form a complete chain that, as a whole, leads so directly to the guilt of the defendant as to exclude beyond a reasonable doubt any reasonable inference other than guilt." *State v. Hanson*, 800 N.W.2d 618, 622 (Minn. 2011). "The evidence as a whole need not exclude all possibility that the defendant is

8

innocent, it must only make such a theory seem unreasonable." *State v. Mathews*, 425 N.W.2d 593, 596 (Minn. App. 1988).

Hendrickson first argues that the circumstantial evidence is insufficient to prove that he actually caused the fire. He does this primarily by attacking Steinbach's "suspect" conclusion that the fire was started in the basement trashcan. Hendrickson argues that "there was indeed evidence to suggest that [the] fire started elsewhere," due to an accidental cause such as a problem with the electrical system or the furnace. In support of this alternative inference, Hendrickson points to the fact that the trashcan was not fully consumed in the fire, that it defies common sense to think that a person could light pieces of wood with an open flame and without an accelerant, and that the furnace may in fact have been running due to the cool weather that day.

This alternative hypothesis put forth by Hendrickson is unreasonable in light of the circumstances proved. It is true that Steinbach did not find conclusive proof that an open flame was applied to the wood in the trashcan, and may have wrongly assumed that the weather was seasonable the day of the offense merely because it was May. But, the record provides no support for Hendrickson's theory that the fire was accidentally started elsewhere. Steinbach testified that the hole in the floor indicated to him that the fire originated in the basement, and he systematically excluded potential accidental causes for the fire given the lack of fire damage on basement appliances, including the circuit breaker, the water softener and water heater, and, most importantly, the furnace. Even if the furnace had been running that day, Steinbach specifically discounted the possibility that fumes from the furnace could have ignited the nearby wood pieces. Based on his

9

exclusion of accidental sources, Steinbach instead focused on the trashcan as the fire's origin due to the "V-pattern" burns spreading up and out from it, as well as the arc vaulting in the electric wiring directly above the trashcan. While he was unable to explain why the trashcan had not fully burned, Steinbach's conclusion was otherwise well-supported, and Hendrickson is unable to pinpoint an alternative reasonable source of the conflagration.

Other evidence indicates that Hendrickson was the only person at the home that day and knew that the fire had started in the basement: he uncharacteristically closed the blinds, left the cat outside all day, went to his apartment nearby and left the home unattended, told firefighters at the scene that the fire started in the basement, and later told police that he had gone to the scene to enter the home's basement. Combined with Steinbach's exclusion of accidental sources and his conclusion that the trashcan was the fire's origin point, the district court correctly drew the only reasonable inference from these circumstances—that the fire was caused by Hendrickson setting the wood-filled trashcan aflame. Without any evidence in support of an accidental cause for the fire, Hendrickson's alternative hypothesis is unreasonable and his challenge to this element of the offense fails.

Hendrickson further claims that the circumstantial evidence is insufficient to prove that he possessed the requisite intent required for conviction of first-degree arson. In support of this claim, Hendrickson points to several facts that he claims indicate his lack of "motive": (1) he and M.H. were still friends; (2) he had no financial incentive to burn down the house; and (3) the record does not show that Hendrickson exhibited violent or

10

destructive tendencies while intoxicated and further lacks evidence as to his specific level of intoxication that day.

However, motive is *not* an element of first-degree arson, and is distinct from the intent that *is* an element of this offense. *See State v. Ness*, 707 N.W.2d 676, 687 (Minn. 2006) ("Motive is not an element of most crimes . . . . [M]otive concerns external facts that create a desire in someone to do something, whereas intent is a state of mind in which an act is done consciously, with purpose." (citation omitted)). Rather, the statute required the state to prove intent by showing that Hendrickson acted with the purpose of destroying or damaging the home, or with the belief that his act would cause the home to be destroyed or damaged. *See* Minn. Stat. § 609.561, subd. 1; *see also* Minn. Stat. § 609.02, subd. 9(3) (2014) (providing that the use of "intentionally" in a criminal statute "means that the actor either has a purpose to do the thing or cause the result specified or believes that the act performed by the actor, if successful, will cause that result").

Despite his emphasis on motive, we can construe Hendrickson's claim as an argument that a reasonable alternative inference from the evidence is that he lacked the requisite intent required for conviction. But, there is ample circumstantial evidence that would have allowed the district court to infer that Hendrickson acted with the purpose of damaging M.H.'s home or with the belief that his act would cause damage to the home. These circumstances specifically exclude an inference that Hendrickson lacked such intent. Rather, the circumstances show that Hendrickson expected that the fire would damage the home and acted accordingly: he closed the blinds and thereby concealed the fire from early detection, put Chipper outside, and then left the home to watch television

11

and nap at his apartment. Hendrickson then indicated to emergency personnel that he was in the house when the fire started and knew that it had originated in the basement. He further demonstrated his disregard for the home while at the scene, telling firefighters to "[j]ust let it burn" because M.H. "has a lot of money." And, while Hendrickson disputes his level of intoxication on appeal, shortly after the fire he admitted that he was intoxicated and his inebriation was corroborated by earlier police observation. But he did not claim, either here or at the district court, that his voluntary intoxication negated any intent. Instead, his alcohol use likely impaired his judgment and makes it more likely that Hendrickson made a rash, but intentional, decision to start a fire in the home's basement.

While the circumstances proved may not conclusively indicate *why* Hendrickson set the fire, they do support the reasonable hypothesis that he did so with the purpose or belief that the fire would damage M.H.'s home. There are simply no circumstances in support of his proposed alternative hypothesis that he did not start the fire and that he lacked intent, and those hypotheses are therefore unreasonable. Thus, we conclude that there was sufficient circumstantial evidence supporting Hendrickson's conviction of first-degree arson.

**Affirmed.**

12