STATE v. A. V. STUART.[1]

July 29, 1938.

No. 31,581.

[1]Reported in 281 N. W. 299.

*Nichols, Mullin & Farnand,* for appellant.

*William S. Ervin,* Attorney General, *Roy C. Frank,* Assistant Attorney General, *Thomas J. Naylor,* County Attorney, and *Victor H. Johnson,* Assistant County Attorney, for the State.

JULIUS J. OLSON, JUSTICE.

Defendant and one Recko were jointly indicted for the crime of forgery in the second degree. Recko pleaded guilty and became a witness for the state. Defendant was convicted and appeals from an order denying his motion for a new trial.

As the indictment is attacked, we quote from its language as follows:

"That on or about the 17th day of July, A. D. 1935, at the City of Duluth in the County of St. Louis and State of Minnesota the said A. V. Stuart and Eli Recko then and there being, having conspired together, acting in concert, and aiding and abetting each other, did wilfully, wrongfully, unlawfully and feloniously, with intent to defraud, utter, dispose of as true to the Sixth Avenue Food Mart, Inc., a corporation, a certain false and forged instrument in writing commonly known as a State Emergency relief order."

A copy of the relief order was thereto attached as an exhibit. Another indictment was found against the same defendants at the same time and for another but similar offense. Defendant's de-

murrer was overruled. Trial was had upon the latter indictment. The jury disagreed. Trial upon the present indictment in May, 1937, resulted in a conviction.

The jury could find the facts to be as follows: Defendant is a man of learning and capacity, having been admitted to the practice of law in Iowa and having practiced his chosen profession at Fort Dodge. In May, 1934, he was given charge of the Single Men's Division of the State Transient Division of the Minnesota State Emergency Relief Administration for the city of Duluth, where he remained until the office closed June 15, 1936. Relief clients were designated as permanent or temporary. The former, before being given that status, were investigated and thereafter given a number and permanent file. It was called a closed or inactive file when the granting of relief to the client was discontinued. Temporary clients were largely transient, drifting men in need of immediate help. These were not investigated. Instead, the office followed the practice of issuing to them so-called informal "white slips" directing some boardinghouse keeper, merchant, etc. to give the man therein named a certain number of meals, lodging, clothing, or whatever service or commodity was to be furnished, at a designated price. When this was provided, the individual so furnishing the goods or service would turn in these slips to the relief office and in due course receive relief orders covering them. The latter were usually issued for $15 each, so that in some cases a considerable number might be required to cover the white slips so presented for payment. The orders when issued were not drawn in the name of a transient or "white slip" recipient. No record was kept of these men. Instead, the named payees in these orders were taken from the closed or inactive files of the so-called "permanent clients." Each such order provided space on the back for signature of the named payee, indicating that the services or goods ordered were received; and on the face, for verification by the named provider, that the same were given. It is obviously true and freely admitted by both sides that the above described "white slip" system was a loose and undesirable one. Undoubtedly it was inefficient and provided a fertile field for

inaccuracies and fraudulent practices. Further proof of that lies in the unquestioned testimony to the effect that indorsements were rarely executed by the payee named on the face of the instrument. It does not appear specifically who, under the system, provided what admittedly were sham indorsements. The fact is, however, that these irregularly executed orders were honored by the relief authorities without question. That most of these orders represented *bona fide* obligations of the relief administration we see no reason to doubt; but that this system afforded ample opportunity for fraudulent conduct is equally true.

This brings us to defendant's claimed errors. As hereinbefore stated, he is specifically charged with forging and altering one of these orders issued in the name of one Charles Evanson by writing said Charles Evanson's name on the back thereof with intent to defraud. We shall take up the assigned claims in the order presented in counsel's briefs.

■ First, it is claimed that the indictment does not charge a public offense. This is founded on the ground that exhibit A, the Evanson order, which was made a part of the indictment, was not verified and therefore "not such a paper as either did or could purport to be the act of another by which a pecuniary demand or obligation was or could purport to have been created." The statute, 2 Mason Minn. St. 1927, § 10325, provides:

"Every person who, with intent to defraud—* * *

"2. Shall forge * * * an instrument or writing, being or purporting to be the act of another, by which a pecuniary demand or obligation is or purports to be or to have been created, increased, discharged, or diminished, or in any manner affected, or by which any rights or property whatever are or purport to be or to have been created, transferred, conveyed, discharged, increased, or diminished, or in any manner affected, the punishment for forging, altering, or counterfeiting which is not hereinbefore prescribed, by which false making, forging, altering, or counterfeiting any person may be bound, affected, or in any way injured in his person or property."

Exhibit A was signed by Eli Recko but not acknowledged before a notary. It is void, such is defendant's claim, because in violation of 1 Mason Minn. St. 1927, § 71, which provides:

"That before any charge, bill or expense account against the state of Minnesota shall be audited, it shall be itemized and verified as to the correctness thereof."

And he further directs our attention to § 766, which provides:

"No account, claim or demand against any municipality for any property or services shall be audited or allowed by the board or officer authorized by law to audit and allow the same until it is reduced to writing, in items, and verified by the person claiming the same, or his agent, to the effect that such account, claim, or demand is just and true; * * *"

As will be noted, § 71 purports to cover "any charge, bill or expense account against the *state of Minnesota.*" (Italics supplied.) We do not take that to govern orders drawn against the relief administration. That agency is merely an instrumentality of the state created by L. 1935, c. 51, for the specified and limited purposes provided by the act. The funds used by it were derived in larger part from the federal government, aided by state and county contributions. The relief orders were issued in payment of obligations voluntarily assumed by this special statutory agency, created and functioning for what was expected to be only a temporary emergency. Secondly, and for a similar reason, § 766 is not controlling because a relief order is not an "account, claim or demand against any *municipality*" (italics supplied), but rather and only is an obligation of an independent statutory agency. Finally, the involved Evanson order, like many others of the same kind, was in fact paid, and the evidence is uncontradicted that the custom was to pay such orders simply when signed, even without acknowledgment. It is our conclusion therefore that the order in question is an instrument by which a pecuniary demand or obligation purports to be or to have been created. We have noted the other phases of defendant's argument on this point, but we do not discuss them

because what has been said is deemed sufficient for the purpose of decision.

■ The second and more weighty argument has to do with the admissibility of the testimony of one Tony Mainella, objection to which the court overruled. In that connection it appears that Mainella was a restaurateur upon whom "white slips" were drawn. His uncontradicted testimony established the following: It often happened that a transient did not appear to claim the services or goods authorized for his use by the "white slips." Consequently, the designated vendor would often have a number of white slips for which he was not entitled to credit. The ordinary practice, at least in the Mainella case, was to deduct the unused white slips from the amount he had coming and execute relief orders for the balance. No cash transactions ever took place. This matter was handled by Martin Johnson, a subordinate of defendant. Between August and November, 1935, Mainella testified that the practice was changed by defendant, who insisted that Mainella should accept and cash the relief orders issued to him without deducting the amount of the unused "white slips" and thereafter pay the difference in cash to defendant. During that period some $400 was so wrong-- fully cashed by Mainella and paid by him to defendant, who never accounted for it by book entry or otherwise. No one other than Mainella and defendant ever knew of that practice, and no cash refunds were ever given to anyone except defendant.

Defendant objected to the admission of that evidence on the ground that it purported to show an independent and immaterial crime, that of larceny. We agree with defendant's statement of the general rule in such cases. It is that "evidence of a distinct and independent offense cannot be admitted on the trial of a defendant charged with a criminal offense" because such admission "would be to oppress a defendant by trying him for an offense of which he has had no notice, and for which he is unprepared, * * *" State v. Austin, 74 Minn. 463, 464, 77 N. W. 301, 302; State v. Fitchette, 88 Minn. 145, 92 N. W. 527; 16 C. J. p. 586 [§ 1132]. There are well established exceptions to that rule, however, which

we have, in harmony with other jurisdictions, repeatedly pointed out. In State v. Sweeney, 180 Minn. 450, 455, 231 N. W. 225, 227, 73 A. L. R. 380, we said:

"The rule, however, like most rules, has certain exceptions not to be stated categorically but among which evidence of other crimes is admissible to prove the accusation when it tends to establish (1) motive, (2) intent, (3) absence of mistake or accident, (4) the identity of the accused, (5) sex crimes, (6) a common scheme or plan embracing the commission of similar crimes so related to each other that proof of one or more of such tends to establish the accusation."

The state offered the Mainella testimony "to show that the relief orders were not issued as *bona fide* relief orders to cover honest claims against the relief administration, but were issued with an *intent* to obtain money for himself, and for the further purpose of showing that he was not the victim of a loose practice in the office, a practice that has been referred to here as the issuing of white slips." In the memorandum accompanying his order denying a new trial the learned trial judge said: "The Mainella evidence, in my opinion, was admissible to show intent and to show that the defendant was not the victim of the so-called white slip system." For the same reason, we hold the questioned evidence admissible.

We have already recognized that the practice of paying the "white slips" was a loose and unwieldy one, also that most orders issued in payment thereof were *bona fide*. The tenor of a great part of the evidence offered in defendant's behalf, and that of his argument below and here, is that the Evanson order in particular was *bona fide* and issued without intent to create a bad faith obligation. And, in effect, that the said order was merely a part of the loose but not *mala fide* practice. Significantly, defendant's brief contains the following comment: "Neither Ann Pocrnich, who wrote a considerable part of the orders introduced in evidence, nor any other person, made any claim directly that any order was a false and fictitious order, but all testified, when asked, that they believed that the orders received by them, if vendors, or written by

them, if employers, were at the time they were handled by them, *bona fide* orders." The implication is that the Evanson order, which was among them, was also untainted. Such attempt at proof clearly raised the issue of intent. Such irregularities and manipulations as were made manifest by the Mainella evidence had a strong and direct tendency to establish the criminal intent on defendant's part in the issuance and utterance of the order here involved. "The rule seems to be well established that the commission of other crimes is admissible if it tends directly or corroboratively to prove a guilty intent of the commission of the wrong charged in the information or some essential element thereof." State v. Omodt, 198 Minn. 165, 171, 269 N. W. 360, 363. See also State v. Voss, 192 Minn. 127, 129, 255 N. W. 843; 2 Dunnell, Minn. Dig. (2 ed. & Supps.) § 2459.

In both matters the specific misconduct charged had to do with the "white slip" system. The irregularities were strikingly similar, the motive identical, so that proof of one was material upon the issue of intent of the other. The court carefully instructed the jury with respect to the limits and purposes of such proof. We think the admission of the questioned evidence was proper under the circumstances here appearing.

■ Lastly, defendant asserts the verdict is not sustained by the evidence, and this has for its foundation claimed lack of corroboration of the testimony of Recko, admittedly an accomplice. This necessitates a more complete statement of the facts than that already made.

The involved relief order was written at defendant's home on the night of July 16, 1935, dated the 17th, and cashed on the 19th. The writer of this and many other orders was Miss Pocrnich, defendant's private secretary. The regularly constituted writers of orders of this type were not asked to serve during the usual and customary office hours, nor at all on this and other similar occasions. At this meeting large batches of this type of orders were written at the direction of defendant. Two full books of such order blanks, "approximately 100 or more in number," were so written. These orders

were written without the knowledge of the one who had in hand and was in direct charge of the "white slips"; nor were there any data or records available or used when these were written. Further to be noted, on this and other similar occasions when this kind of work was being done, defendant would have before him the files containing the original handwriting of the relief client in whose name the order was to be written. He simulated the signatures of these in writing the name on the back of the order. He even asked Miss Pocrnich to imitate the real signature of such relief client in one of these files. She testified: "Well, Mr. Stuart pushed a file over to my side of the table and one on which the order had already been written, and he asked me to sign the client's name, so I signed it the way I would write my own name, and he told me to erase it and see if I could not make it more like the handwriting in the file, so I erased it and I wrote it all over again and he said, 'That is better.'" The state proved that the signatures on three orders written about the same time were in the defendant's handwriting, although obviously the signatures were an imitation of the originals. Neither Recko nor Mainella had any opportunity to examine the records in the relief administration office. The same holds true respecting the so-called relief clients. Defendant had access to these office files and made use of them. And he, probably sensing investigation, prepared Miss Pocrnich with regard thereto and instructed her what to say to the official inquirer if such inquiry were made. This order and others of its type were not posted on the posting sheets. This was contrary to the going practice. The girls having this in hand were told not to post the orders written by them. To defendant Recko 23 orders were written at the July 16 meeting. The Evanson order is one of them. As to some of these, exhibits C, D, and E, written in favor of one Hoblock, the relief client could not write his own name, hence it was necessary that his indorsement be written with a cross, someone else of course writing his name. The young lady present testified that the writing on the back of these orders was that of defendant. Recko testified that he consented to go along with defendant in

handling these orders, testified to by him as "crooked orders," upon the threat on defendant's part that if he did not do so relief clients would no longer be sent to him. During July, so he claims, he had no "white slips" to exchange for the large number of "crooked orders" brought him through defendant's efforts. These orders were delivered in envelopes, the first containing twenty $15 relief orders ($300), the second $225, and the third $175. All were cashed by Recko and the money given to defendant in small amounts spread over a period of several months. The money payments to defendant by Recko were made at various places in the city and were dependent upon telephone or other verbal instructions from defendant. Nothing pertaining to these orders was settled at or through the office where all this business should properly have been done.

There is much more that could be added to what already has been stated, but we think enough has been shown to sustain the conclusion reached, i. e., that there is ample evidence to sustain the conviction. Perhaps we might again refer to the Mainella testimony, which fortified, we think, the state's claim that defendant was engaged in issuing fictitious relief orders diverting the funds available thereby to his own use. It was all part and parcel of the same purpose and scheme, i. e., to cheat and defraud by means of the preparation and utterance of false and fraudulent relief orders for personal gain.

Defendant's guilt has been proved to the point of almost, if not quite, demonstrable certainty. We have seen the forger at work faking indorsements, suggesting to his secretary the same kind of practice. He was accorded every right and privilege of an accused person. He availed himself of his right to testify in his own behalf. The jury heard him and saw him. They did not believe his story, nor do we. Anyone reading this lengthy record (more than 400 pages, and numerous and voluminous exhibits) can come to no other conclusion than that defendant's perfidy is obvious, his guilt beyond doubt.

The order is affirmed.

Loring, Justice (dissenting).

In view of the general rule that proof of independent offenses of the same nature as the one for which the accused is tried cannot be given in evidence as a makeweight against him, I am inclined to the view that it was error to admit the evidence in regard to the transactions with Mainella. They were wholly unrelated to the conspiracy with Recko to defraud by means of forged relief orders. True, in State v. Sweeney, 180 Minn. 450, 231 N. W. 225, 73 A. L. R. 380, cited by the majority, evidence of other offenses was admitted, but they were all shown to be part of the same conspiracy with Maurer to conduct a general and systematic scheme in furtherance of a mutually coöperative corrupt arrangement for obtaining bribes. It is unnecessary to repeat here what was said by this court in State v. Fitchette, 88 Minn. 145, 92 N. W. 527, where it was held error to receive evidence of a like crime committed some months previous to the one charged. The exceptions to the rule excluding such evidence were there thoroughly discussed. The most usually invoked exception is that which permits evidence of similar crimes when the defendant claims accident or mistake. Then the evidence is admitted to contradict the claim and show intent. No such claim is made here. The claim is that the Evanson order was *bona fide* and so considered by all, although concededly it was, like many others under the system, fictitious as to Evanson. Certainly any evidence which contradicted the defendant's good faith in regard to this order was admissible, but the Mainella evidence related to white slips for which genuine relief orders were issued and the proceeds given defendant. These transactions were conducted with an entirely different person in furtherance of a separate and distinct conspiracy and scheme to defraud. It was not a part of the common scheme or plan of which the offense charged was a part. As said in State v. Fitchette, 88 Minn. 148, 92 N. W. 528:

"Where the exception to the general rule thus stated is doubtful in any particular instance, and the trial judge does not clearly perceive that the evidence falls within its purview, the accused is to be given the benefit of the doubt, and the evidence rejected. [Citing cases.]

\* \* \* it is not the rights of those alone who may be guilty of other offenses for whom the solicitude of the law is to be exercised, but it is more particularly for the innocent, oppressed with unfounded suspicions, who may find no other shield for his protection than an intelligent enforcement of his constitutional safeguards by the courts."

Nothing so prejudices the mind of the trier of fact as evidence that the accused has been guilty of other offenses. Therefore its admission should be permitted only in a case where it comes clearly within some exception to the rule excluding it. I think there should be a new trial and this evidence excluded.

GALLAGHER, CHIEF JUSTICE (dissenting).
I agree with the views expressed by Mr. Justice Loring.

PETERSON, JUSTICE (dissenting).
I concur in the dissent of Mr. Justice Loring.

