STATE OF MINNESOTA

IN SUPREME COURT

A15-0345

Hennepin County
Hudson, J.
Concurring, Stras, J.
Took no part, Chutich, McKeig, JJ.

State of Minnesota,

       Respondent,

vs.
Filed: November 16, 2016
Office of Appellate Courts

Diamond Lee Jamal Griffin,

       Appellant.

_____

Lori Swanson, Attorney General, Saint Paul, Minnesota; and

Michael O. Freeman, Hennepin County Attorney, Elizabeth R. Johnston, Assistant County Attorney, Minneapolis, Minnesota, for respondent,

Cathryn Middlebrook, Chief Appellate Public Defender, Roy G. Spurbeck, Assistant State Public Defender, Saint Paul, Minnesota, for appellant.
_____

S Y L L A B U S

1.     Even if the district court erred in admitting *Spreigl* evidence, there is no reasonable possibility that the evidence significantly affected the verdict.

2.     The district court did not abuse its discretion when it denied appellant's motion for a mistrial.

1

3.      The State presented evidence sufficient to prove beyond a reasonable doubt that appellant intentionally shot and killed the victim.

4.      None of the claims in appellant's pro se brief have merit.

Affirmed.

O P I N I O N

HUDSON, Justice.

Following a jury trial, appellant Diamond Lee Jamal Griffin was convicted of first-degree felony murder, Minn. Stat. § 609.185(a)(3) (2014), in connection with the shooting death of Francisco Benitez-Hernandez.[1]  On appeal, Griffin contends the district court committed reversible error when it admitted *Spreigl* evidence and when it denied his motion for a mistrial.  He also claims that the State failed to present sufficient evidence to prove he intentionally killed Benitez-Hernandez.  In a supplemental pro se brief, Griffin raises a number of other claims.  Because (1) there is no reasonable possibility that the *Spreigl* evidence significantly affected the verdict; (2) the district court did not abuse its discretion when it denied Griffin's motion for a mistrial; (3) the State's evidence was sufficient to prove Griffin intentionally killed Benitez-Hernandez; and (4) Griffin's pro se claims lack merit, we affirm his conviction.

On the night of July 8, 2013, Griffin, his girlfriend K.F., and his childhood friend Ryan Grant drove to an apartment complex in south Minneapolis.  About two weeks earlier,

---

[1]      Griffin was also convicted of an attempt offense, Minn. Stat. § 609.17 (2014), in which the uncompleted offense was first-degree intentional murder, Minn. Stat. § 609.185(a)(3), in connection with gunfire directed at L.B-H., and second-degree assault, Minn. Stat. § 609.222 (2014), arising out of conduct involving P.Y-E.

Griffin and Grant had jointly purchased a .22 semiautomatic pistol. Griffin and Grant left K.F.'s car with the pistol and tried to rob a man who was walking down the street. As part of the robbery attempt, Grant hit the man in the head with the pistol. The man ran away.

After the unsuccessful robbery, Griffin and Grant walked down a nearby alley until they reached the backyard of 3629 Columbus Avenue South, which was the home of Francisco Benitez-Hernandez and L.B-H. Benitez-Hernandez, L.B-H., and their brother-in-law P.Y-E. were in the backyard sitting at a table drinking beer. As Griffin and Grant entered the backyard, Griffin aimed the pistol at Benitez-Hernandez. When Griffin demanded money, Benitez-Hernandez said they had no money. Griffin then hit Benitez-Hernandez with the gun in the head above his eyebrow, causing Benitez-Hernandez to bend over and hold his bleeding head. L.B-H. stood up and threw a beer bottle at Griffin in an effort to distract him. Griffin ducked out of the way, fell backward, caught himself, and then "turned around and . . . fired at [L.B-H.]." The bullet struck L.B-H. just above the elbow of his left arm. As L.B-H. ran to get help, Benitez-Hernandez grabbed Griffin's leg. Griffin redirected the pistol at Benitez-Hernandez's chest and fired a shot. The bullet penetrated Benitez-Hernandez's chest, fatally wounding him. Griffin and Grant fled the scene before the police arrived.

Although the police did not find a firearm at the scene, they found two spent cartridge casings in the backyard near Benitez-Hernandez's body. Police also located two cell phones in the yard, one belonging to L.B-H., and the other belonging to P.Y-E. L.B-H. described the robbers as two black men in white t-shirts. Based on the statements of witness J.M., a resident of a nearby apartment building, police searched that apartment

3

building's parking lot and found an identification card belonging to Griffin's girlfriend, K.F. Police also located a take-out food container and a fork near the identification card that were later determined to have K.F.'s DNA on them.

Police located K.F. on July 9, 2013 and spoke to her twice that day, once at her place of employment and again at the police department. She was hesitant to speak with the police but eventually told them that she had been with Griffin on the day of the killing. Also on July 9, police stopped K.F.'s car with Griffin and Grant inside. Griffin was driving and Grant was in the passenger seat. The police arrested the men and seized Griffin's clothing, including a white tank top, a belt, jean shorts, and black Nike shoes. The police seized Grant's shoes and a cell phone. The police also executed a search warrant at Grant's home where they seized a white t-shirt, a white tank top, and black shorts with a white stripe.

The items the police collected at the scene and the clothes and shoes seized from Griffin and Grant were sent to the Minnesota Bureau of Criminal Apprehension (BCA) for forensic testing. The serologist found a blood spot on Griffin's left shoe and a blood spot on his right shoe. The serologist also found blood on four areas of the jean shorts belonging to Griffin. No blood was found on Griffin's shirt or belt, or on the t-shirt, tank top, shorts, or shoes taken from Grant. The blood found on Griffin's clothing and shoes matched Benitez-Hernandez's DNA. The spent casings found in the backyard of 3629 Columbus Avenue South were all fired from the same gun, a .22 semiautomatic pistol. With Grant's help, the police recovered the .22 semiautomatic pistol used in the shooting in August 2014

4

from a person identified as D.D. Testimony by the investigating officer established that a semiautomatic pistol requires a person "to pull the trigger for each round that you fire."

Grant pleaded guilty as an accomplice to three crimes: the felony murder of Benitez-Hernandez, the attempted second-degree murder of L.B-H., and the aggravated robbery of P.Y-E. In exchange for assisting the police in locating the gun and for testifying against Griffin at trial, Grant received a reduced sentence of 234 months in prison.

A Hennepin County grand jury returned an indictment charging Griffin with six offenses. The first count alleged the offense of first-degree felony murder (Benitez-Hernandez), Minn. Stat. § 609.185(a)(3). The second count alleged the offense of second-degree intentional murder (Benitez-Hernandez), Minn. Stat. § 609.19, subd. 1(1) (2014). The third count alleged the offense of attempt, Minn. Stat. § 609.17 (2014), in which the uncompleted offense was first-degree felony murder (L.B-H.), Minn. Stat. § 609.185(a)(3). The fourth count alleged the offense of attempt, Minn. Stat. § 609.17, in which the uncompleted offense was second-degree intentional murder (L.B-H.), Minn. Stat. § 609.19, subd. 1(1). The fifth count alleged the offense of second-degree assault (P.Y-E.), Minn. Stat. § 609.222, subd. 1 (2014). The sixth count alleged the offense of aggravated robbery (P.Y-E.), Minn. Stat. § 609.245, subd. 1 (2014). Griffin pleaded not guilty to each of the charges.

At the jury trial, the State presented evidence consistent with the facts outlined above. Over Griffin's objection, the district court allowed the State to present *Spreigl* evidence of a 2008 incident. In addition, when the prosecutor asked Griffin's girlfriend "Do you remember telling your boss that you thought your boyfriend killed somebody?"

5

Griffin objected and moved for a mistrial. The district court sustained the objection, provided the jury a curative instruction, and denied the mistrial motion. The jury returned a not guilty verdict on Count 6 and guilty verdicts on Counts 1, 3, and 5. The district court sentenced Griffin to life in prison on Count 1; to 153 months in prison on Count 3, to be served consecutively to Count 1; and to 36 months in prison on Count 5, to be served consecutively to Counts 1 and 3. Griffin now appeals.

I.

Griffin argues the district court committed reversible error when it admitted the 2008 *Spreigl* evidence.[2] Specifically, he contends the State failed to articulate a valid purpose for admitting the *Spreigl* evidence, and that any probative value of the *Spreigl* evidence was outweighed by the risk of unfair prejudice.

A district court's decision to admit *Spreigl* evidence is reviewed for an abuse of discretion. *State v. Rossberg*, 851 N.W.2d 609, 615 (Minn. 2014). A defendant who claims the trial court erred in admitting evidence bears the burden of showing an error occurred and any resulting prejudice. *State v. Campbell*, 861 N.W.2d 95, 102 (Minn. 2015). If an appellate court determines that the district court erroneously admitted *Spreigl* evidence, the court must then determine whether there is a reasonable possibility that the wrongfully admitted evidence significantly affected the verdict. *State v. Bolte*, 530 N.W.2d 191, 198 (Minn. 1995).

---

[2]    *Spreigl* evidence, or evidence of another crime, wrong, or act, Minn. R. Evid. 404(b), is addressed in *State v. Spreigl*, 272 Minn. 488, 139 N.W.2d 167 (1965).

At trial, the State called O.R-H., who testified that on January 3, 2008, he was walking to work and was at First Avenue and 27th Street in Minneapolis when he noticed two men walking behind him. Approximately one block later, one of the men ran up behind him. When O.R.-H. turned around, the man punched him in the nose and rummaged through his jacket and pants pockets for money. O.R-H. was unable to make an in-court identification. The State then called Officer Keia Pettis, who testified that on January 3, 2008, during a show-up identification procedure, O.R-H identified Griffin as the person who attempted to rob him.

We need not decide whether the district court erred in admitting the *Spreigl* evidence because, even if we assume that the evidence was erroneously admitted, there is no reasonable possibility that the *Spreigl* evidence significantly affected the verdict. The district court gave the jury a cautionary instruction regarding the permissible use of *Spreigl* evidence and we presume that the jurors followed the district court's instruction. *State v. Clark*, 755 N.W.2d 241, 261 (Minn. 2008) (explaining that any concerns regarding the prejudicial impact of the *Spreigl* evidence were minimized by the cautionary instruction on the permissible use of *Spreigl* evidence because we presume that jurors followed the court's instructions). Moreover, the evidence of Griffin's guilt was considerable.[3] The DNA evidence strongly suggested that Griffin was the shooter because Benitez-Hernandez's blood was on Griffin's shoes and shorts, and none of Benitez-Hernandez's blood was on

---

[3]     In *State v. Huber*, 877 N.W.2d 519, 527 (Minn. 2016), we observed that the words "considerable," "ample," and "overwhelming" describe a large quantum of evidence presented by the State on the contested element.

Grant's shoes or clothing.  Thus, even if the district court erred in admitting the *Spreigl* evidence, there is no reasonable possibility that the evidence significantly affected the verdict.

## II.

Griffin also argues that the district court committed reversible error when it denied his motion for a mistrial.  The denial of a motion for a mistrial is reviewed for an abuse of discretion.  *State v. Jorgensen*, 660 N.W.2d 127, 133 (Minn. 2003).  A mistrial should be granted only if there is a reasonable probability, in light of the entirety of the trial including the mitigating effects of a curative instruction, that the outcome of the trial would have been different had the incident resulting in the motion not occurred.  *State v. Manthey*, 711 N.W.2d 498, 506-07 (Minn. 2006).  The trial judge is in the best position to determine whether an error is sufficiently prejudicial to require a mistrial or whether another remedy is appropriate.  *Id.*  When a court instructs a jury to disregard an improper question, we presume the jurors followed the instruction.  *State v. Pendleton*, 706 N.W.2d 500, 509 (Minn. 2005).

On direct examination, the following exchange occurred between the prosecutor and Griffin's girlfriend:

Q: And do you remember confiding, telling your boss some concern that you had?
A: Yes.
Q: What was it that you told your boss?
A: Well, I wasn't, it wasn't my boss, I was talking to a co-worker.
Q: Okay.
A: But it was just like that, I didn't know what was going on and I told her some stuff then it was just confusing and then I told her what was going— like what happened, stuff that was going on.

Q: Okay. Do you remember what it was you told your boss or what it was you told this co-worker that the boss overheard, what were the words you used?

A: Um, I'm not for sure. I remember telling her I was scared.

Q: Okay. Do you remember telling your boss that you thought your boyfriend killed somebody?

The defense objection to the last question was immediately sustained and no answer was given. At the conclusion of the direct examination, the defense moved for a mistrial. The district court denied the motion, but granted the alternative request for a curative instruction and instructed the jury that "[i]t was an improper question . . . so you are to totally disregard that question, and there was no answer." The district court determined that declaring a mistrial was unnecessary in light of the prompt, sustained objection, its strongly worded curative instruction specifically identifying the prosecutor's question as improper, and the fact that no answer had come from the question. The district court also instructed the jury in opening and closing instructions that the questions of attorneys are not evidence, that they may consider only properly admitted evidence, that they should ignore and not speculate about unanswered questions, and that any evidence the court orders stricken must be disregarded.

In light of the strongly worded curative instruction, the presumption that juries follow the district court's instructions, and the DNA evidence suggesting Griffin's guilt, we conclude that there is no reasonable probability that the prosecutor's question affected the outcome of the trial. The district court therefore did not commit reversible error when it denied Griffin's motion for a mistrial.

Griffin argues the State failed to present sufficient evidence to prove that he intentionally killed Benitez-Hernandez. Specifically, he contends that the circumstances proved support a reasonable inference that the firing of the gun was the "product of accidental discharge due to being grabbed and falling."

When evaluating the sufficiency of the evidence, appellate courts "carefully examine the record to determine whether the facts and the legitimate inferences drawn from them would permit the jury to reasonably conclude that the defendant was guilty beyond a reasonable doubt of the offense of which he was convicted." *State v. Boldman*, 813 N.W.2d 102, 106 (Minn. 2012). The evidence must be viewed in the light most favorable to the verdict, and it must be assumed that the fact-finder disbelieved any evidence that conflicted with the verdict. *State v. Palmer*, 803 N.W.2d 727, 733 (Minn. 2011). The verdict will not be overturned if the fact-finder, upon application of the presumption of innocence and the State's burden of proving an offense beyond a reasonable doubt, could reasonably have found the defendant guilty of the charged offense. *Bernhardt v. State*, 684 N.W.2d 465, 476-77 (Minn. 2004).

Minnesota Statutes § 609.185, subd. (a)(3), requires the State to prove beyond a reasonable doubt that a defendant "cause[d] the death of a human being with intent to effect the death of the person or another, while committing or attempting to commit . . . aggravated robbery . . . ." Minn. Stat. § 609.185, subd. (a)(3). It is rare for the State to

establish a defendant's state of mind through direct evidence. *State v. McAllister*, 862 N.W.2d 49, 53 (Minn. 2015).

When the State relies entirely on circumstantial evidence to prove the element of intent, we use a two-step test to determine whether the State presented sufficient evidence of intent. *Id*. at 53-54. First, we identify the circumstances proved, deferring to the jury's acceptance of the proof of these circumstances and rejection of evidence in the record that conflicted with the circumstances proven by the State. *State v. Matthews*, 800 N.W.2d 629, 635 (Minn. 2011) (citing *State v. Andersen*, 784 N.W.2d 320, 329 (Minn. 2010)). Second, we examine the reasonable inferences that might be drawn from the circumstances proved, giving no deference to the fact-finder's choice between reasonable inferences. *Id.* The conviction is sustained if the reasonable inferences that can be drawn from the circumstances proved as a whole are consistent with the hypothesis that the accused is guilty and inconsistent with any rational hypothesis except that of guilt. *Andersen*, 784 N.W.2d at 332 (citing *State v. Curtis*, 295 N.W.2d 253, 258 (Minn. 1980)).

We begin our analysis by identifying the circumstances proved, which in this case are as follows. Griffin and Grant bought a .22 semiautomatic pistol together. A semiautomatic pistol requires a person to pull the trigger for each round fired. On July 8, 2013, Griffin and Grant took the pistol to south Minneapolis and failed in an attempt to rob a man on the street. Grant hit the man in the head with a .22 semiautomatic pistol in Griffin's presence. A short time later, Griffin and Grant decided to rob Benitez-Hernandez, L.B-H., and P.Y-E. After Griffin and Grant entered the backyard, Griffin aimed the pistol at Benitez-Hernandez. When Griffin demanded money, Benitez-Hernandez said they had

11

no money.  Griffin then hit Benitez-Hernandez in the head above his eyebrow with the gun, causing Benitez-Hernandez to bend over and hold his bleeding head.  L.B-H. stood up and threw a beer bottle at Griffin in an effort to distract him.  Griffin ducked out of the way, fell backward, caught himself, and then "turned around and . . . fired at [L.B- H.]."  The bullet struck L.B-H. just above the elbow of his left arm.  As L.B-H. ran to get help, Benitez-Hernandez grabbed Griffin's leg.  Griffin redirected the pistol at Benitez-Hernandez's chest and pulled the trigger.[4]  The bullet penetrated Benitez-Hernandez's chest, fatally wounding him.  Benitez-Hernandez's blood was found on Griffin's shorts and shoes but no blood was found on Grant's clothing or shoes.

The second step is to determine whether the reasonable inferences that can be drawn from the circumstances proved as a whole are consistent with the hypothesis that Griffin is guilty and inconsistent with any rational hypothesis except that of guilt.  The circumstances

---

[4]    Griffin claims he was falling when the gun fired the bullet that struck Benitez-Hernandez in the chest.  However, Grant testified that Griffin regained his balance before shooting Benitez-Hernandez.  More specifically, the prosecutor and Grant engaged in the following colloquy:

> Q:    When you said grabbed his leg, do you mean he actually made
>        physical contact with him?
> A:    I believe so, yes.
> Q:    Did Diamond Griffin regain his composure or did he stand back up?
> A:    Yes, he did.
> Q:    What happened then?
> A:    The gun went off.

Consequently, Griffin's contention that he was falling is *not* one of the circumstances proved in this case.  *State v. Fairbanks*, 842 N.W.2d 297, 307 (Minn. 2014) (explaining that in identifying the circumstances proved, we assume the jury accepted the State's proof of the given circumstances and rejected any evidence in the record to the contrary).

12

proved support a reasonable inference that Griffin shot Benitez-Hernandez with an intent to kill him. Griffin brought a loaded gun to the robbery, fired the gun in L.B-H.'s direction (eliminating any question as to the gun's functionality), paused to regain his balance, redirected the gun toward Benitez-Hernandez, and then pulled the trigger. Moreover, the close proximity of the gun to Benitez-Hernandez's chest made fatal damage to a vital organ a near certainty. Thus, the circumstances proved in this case support a rational inference that Griffin shot Benitez-Hernandez with an intent to kill. *See State v. Young*, 710 N.W.2d 272, 278-79 (Minn. 2006) (explaining that a jury may infer a person's intent to kill from the nature of the killing).

We also conclude that the circumstances proved are inconsistent with a rational hypothesis other than guilt. Specifically, the circumstances proved do not support a rational inference that the firing of the gun was the product of accidental discharge due to being grabbed and falling. Although Griffin and Grant used the handgun to beat Benitez-Hernandez and another man earlier that evening, there is no evidence that the gun accidentally discharged during either of those beatings. Instead, the circumstances proved establish that the handgun was fully functional; Griffin had to pull the trigger to fire each round; and Griffin regained his balance before redirecting the gun toward Benitez-Hernandez's chest and pulling the trigger. Thus, the circumstances proved do not support a rational inference that the firing of the gun was the product of an accidental discharge.

In sum, the circumstances proved in this case are consistent with a reasonable inference that Griffin shot Benitez-Hernandez with an intent to kill and inconsistent with a reasonable inference that the firing of the gun was the product of accidental discharge due

13

to being grabbed and falling. Accordingly, we conclude that the State presented sufficient evidence to support Griffin's conviction.

## IV.

In his pro se brief Griffin presented six additional issues to the court, specifically, whether: (1) the evidence was sufficient to prosecute Griffin for aiding and abetting Grant in the commission of the offense; (2) the district court erred by not, sua sponte, excluding Griffin's testimony about the earlier attempted robbery; (3) the State failed to corroborate Grant's accomplice testimony; (4) Grant's testimony violated the Confrontation Clause of the Sixth Amendment to the United States Constitution; (5) Griffin's counsel was ineffective for not requesting that a witness's cell phone be tested for fingerprints; and (6) the cumulative trial errors deprived Griffin of a fair trial. After thoroughly reviewing each issue, we conclude that none have merit.

Affirmed.


CHUTICH, J., not having been a member of this court at the time of submission, took no part in the consideration or decision of this case.

MCKEIG, J., not having been a member of this court at the time of submission, took no part in the consideration or decision of this case.

14

CONCURRENCE

STRAS, Justice (concurring).

I join the court's opinion, but write separately to address a strange turn in our law on the admissibility of other-bad-acts evidence, which we have also referred to as *Spreigl* evidence. Minnesota Rule of Evidence 404(b), which generally renders such evidence inadmissible, states that

> [e]vidence of another crime, wrong, or act is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

The district court's decision to admit the other-bad-acts evidence in this case demonstrates the problem with our current interpretation of the word "plan." Over time, we have imported the modus-operandi analysis from the exception for "identity" evidence into the test for admitting evidence of a "plan."

This development has distorted the analysis under Rule 404(b) in two ways. First, it has conflated the standards for evaluating the admissibility of identity and plan evidence, which are separate categories of evidence under Rule 404(b). Second, the now-sweeping scope of the plan exception risks the admission of evidence that a person is acting in conformity with his or her bad character, which violates the categorical prohibition on propensity evidence in the first sentence of Rule 404(b). All that is required under the plan exception today is that a defendant's prior bad acts be "markedly similar" to the acts with which he or she is charged, *State v. Ness*, 707 N.W.2d 676, 689 (Minn. 2006), which is precisely the type of evidence that a jury is most likely to treat as propensity evidence. To

C-1

fix what I believe has become a textual conflict in Rule 404(b), I would refer this matter to the Advisory Committee for the Rules of Evidence for further study and action.

I.

Before addressing how I would resolve the conflict, I begin with a discussion of the evolution of the law on other-bad-acts evidence. In *State v. Sweeney*, decided long before the Minnesota Rules of Evidence came into existence, we announced six exceptions to the "general rule" that "evidence which in any manner shows or tends to show that the accused has committed another crime independent of that for which he is on trial is inadmissible." 180 Minn. 450, 455, 231 N.W. 225, 227 (1930). In *Sweeney*, we explained that this general rule

> has certain exceptions not to be stated categorically, but among which evidence of other crimes is admissible to prove the accusation when it tends to establish (1) motive; (2) intent; (3) absence of mistake or accident; (4) the identity of the accused; (5) sex crimes; (6) *a common scheme or plan embracing the commission of similar crimes so related to each other that proof of one or more of such tends to establish the accusation.* Such is the common law.

*Id.* at 455, 231 N.W. at 227 (emphasis added); *see also State v. Fitchette*, 88 Minn. 145, 148, 92 N.W. 527, 528 (1902) (allowing the admission of evidence of a previous uncharged offense "where the previous offense is a part of a scheme or conspiracy incidental to or embraced in proof of the charge on trial"). We clarified that a common scheme or plan "involves a general and composite plan or scheme." *Sweeney*, 180 Minn. at 455, 231 N.W. at 227. According to *Sweeney*, "[s]ome connection between the crimes must be shown to have existed in fact and in the mind of the defendant, uniting them for the accomplishment

C-2

of a common purpose before such evidence can be received." *Id.* at 455-56, 231 N.W. at 227-28.

Initially, the common-scheme-or-plan exception "was intended primarily to cover such cases as larceny, embezzlement, forgery, and swindling." *State v. Spreigl*, 272 Minn. 488, 492 n.9, 139 N.W.2d 167, 170 n.9 (1965). It was "originally reserved for those offenses which could be described as preplanned steps in a larger scheme of which the charged offense was another step." *Ness*, 707 N.W.2d at 687 (quoting *State v. Forsman*, 260 N.W.2d 160, 167 (Minn. 1977)) (internal quotation marks omitted). There must have been "such a relation between the offenses that they were part of one transaction." *Spreigl*, 272 Minn. at 492 n.9, 139 N.W.2d at 170 n.9 (citing, among other cases, *State v. Wofford*, 262 Minn. 112, 118, 114 N.W.2d 267, 271 (1962); *State v. Thompson*, 241 Minn. 59, 67, 62 N.W.2d 512, 519 (1954); *State v. Yurkiewicz*, 212 Minn. 208, 210, 3 N.W.2d 775, 776 (1942); *State v. Stuart*, 203 Minn. 301, 306, 281 N.W. 299, 302 (1938); and *Sweeney*, 180 Minn. at 455, 231 N.W. at 227). The plan exception at common law, in other words, was limited to evidence showing a progression of criminal behavior, each step of which was part of one overall scheme or plan.[1]

---

[1] Consider an example of the common-scheme-or-plan exception at common law. Suppose that a defendant commits a robbery to obtain money to purchase a firearm to commit a murder. If the defendant were successful in the commission of both crimes, the evidence of the earlier robbery would be admissible to show a composite plan—that is, "preplanned steps in a larger scheme." *Ness*, 707 N.W.2d at 687. Under these circumstances, the evidence of the earlier robbery would allow the jury to make "the permissible inference that, regardless of character, a person who has formulated a plan is more likely to carry out the elements of the plan," 1 *McCormick on Evidence* § 190 (Kenneth S. Broun ed., 7th ed. 2016), not to infer that the defendant has a propensity to commit crimes.

Another admissible category of other-bad-acts evidence discussed in *Sweeney* was identity evidence, which required a unique "pattern of conduct." *State v. Bowser*, 305 Minn. 431, 436, 234 N.W.2d 890, 893 (1975). This type of evidence, commonly referred to as a modus operandi, is a signature that allows the jury to infer that the same person committed two separate crimes by virtue of the unique manner in which the crimes were committed. *See id.* at 435-36, 234 N.W.2d at 892-93. When the identity of the perpetrator is in dispute, the presence of a unique "signature" can make it "highly probable" that the defendant, if he or she committed the first crime, is also the perpetrator of the subsequent crime.[2] *See, e.g.*, *Thompson v. State*, 690 N.E.2d 224, 234 (Ind. 1997); *see also People v. Engelman*, 453 N.W.2d 656, 662 (Mich. 1990) (explaining the permissible uses of other-bad-acts evidence, including identity evidence).

For the most part, these two exceptions were completely separate before 1977, when the Minnesota Rules of Evidence first came into existence. The common-law rule, as enunciated in *Sweeney*, became Minn. R. Evid. 404(b).[3] That same year, however, we also

---

[2]   A textbook example of the "identity" exception will demonstrate its historically narrow scope. Suppose that a defendant committed a robbery several years ago, and did so while wearing a distinctive mask. A recent robbery also involves a person who wore the same type of mask. The defendant's commission of the prior robbery would be admissible, assuming the identity of the perpetrator of the most recent robbery is in dispute, to demonstrate that the same person committed both crimes. *See generally United States v. LeCompte*, 99 F.3d 274, 278-79 (8th Cir. 1996) (explaining what qualifies as a signature criminal pattern).

[3]   At that time, Rule 404(b) stated:

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith.

decided *State v. Forsman*, 260 N.W.2d 160 (Minn. 1977), which conflated what had previously been distinct inquiries for identity and plan evidence. Specifically, we explained that the plan exception had "evolved to embrace evidence of offenses which, because of their marked similarity in modus operandi to the charged offense, tend to corroborate evidence of the latter [offense]." *Id.* at 167. Our discussion in *Forsman* was the starting point for the eventual merger of the standards governing the admissibility of identity and plan evidence under Rule 404(b). After *Forsman*, the standard evolved from the common-law focus on the existence of an overall scheme or plan that may involve multiple crimes, regardless of the similarity of each individual crime, to an exclusive focus on the similarity among the crimes, regardless of their connection.

Our holding in *Forsman* principally depended upon a single case, *State v. Taylor*, which did not support *Forsman*'s reasoning. 290 Minn. 515, 187 N.W.2d 129 (1971). *Taylor* involved the prosecution of an individual who was in the "business of prostitution." *Id.* at 515, 187 N.W.2d at 130. The district court allowed the State to present evidence that the defendant had previously held another woman hostage in his apartment and sexually assaulted her under facts that were substantially similar to the facts of the charged offense. *Id.* at 517, 187 N.W.2d at 131. The district court admitted the evidence for a variety of reasons, including to show a common scheme or plan, a method of operation (i.e., identity),

---

It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, *plan*, knowledge, *identity*, or absence of mistake or accident.

Minn. R. Evid. 404(b) (1978) (emphasis added).

a motive, and criminal intent. *Id.* at 517, 187 N.W.2d at 131. Without suggesting that we were affirming the trial court's decision on any one of these individual grounds, we stated in *Taylor* that "[t]he determination of whether the independent criminal acts are so closely related to the crime charged as to be admissible" was a matter within the district court's discretion. *Id.* at 517, 187 N.W.2d at 131. Given our reliance on the district court's broad discretion and not the application of any individual exception, it is just as likely that we affirmed the admission of the other-bad-acts evidence as identity evidence as it was that we did so under the plan exception. It is reasonable to suggest, therefore, that *Forsman*'s merger of the standards for identity and plan evidence, which now both turn on similarity, may have just been an accident, not a deliberate decision.

In a 2006 decision, *State v. Ness*, we attempted to clarify the test for admitting other-bad-acts evidence under the plan exception, which by the time *Ness* was decided, had morphed into a substantial-similarity standard. 707 N.W.2d at 688. In *Ness*, we explained that, "in determining whether a bad act is admissible under the common scheme or plan exception, it must have a *marked* similarity in modus operandi to the charged offense," *id.* (emphasis added), not just a *substantial* similarity, *see, e.g.*, *State v. Kennedy*, 585 N.W.2d 385, 391 (Minn. 1998). *Ness* was an attempt to retreat from our prior decisions that had expansively interpreted the word "plan" under Rule 404(b), including *Kennedy*. *See Ness*, 707 N.W.2d at 688 ("The common scheme or plan exception may have been applied more broadly than it should [have] be[en]."). According to *Ness,* we were backtracking to avoid having the exception for plan evidence swallow the categorical rule against propensity evidence. *See id.* ("[T]he closer the relationship between the other acts and the charged

offense, in terms of time, place, or modus operandi, the greater the relevance and probative value of the other-acts evidence and the lesser the likelihood that the evidence will be used for an improper purpose.").

Though laudable in its goal of reconciling our case law, *Ness* solved one problem but exacerbated another. It narrowed the circumstances under which courts could admit other-bad-acts evidence by requiring a "marked similarity" between the prior bad act and the charged offense, but it did not solve the problem created by *Forsman*, which had inadvertently merged the identity and plan exceptions. By requiring an even closer similarity between the prior bad act and the charged offense, *Ness* paradoxically preserved the admissibility of the evidence that a jury would be most likely to misuse as propensity evidence. As a matter of logic and contrary to our analysis in *Ness*, the greater the factual similarities between the charged crime and the prior bad acts, the more likely it is that the jury will improperly draw the inference that the defendant committed the charged crime. Faced with evidence that a defendant has committed five markedly similar robberies, for example, a jury is likely to infer that the defendant committed a sixth robbery even if there is no other evidence of guilt. In other words, after *Ness* changed the standard back to marked similarity, the plan exception now applies in narrower circumstances and in fewer instances, but it allows courts to admit *only* the evidence that the jury is most likely to misuse.

Even after narrowing it in *Ness*, the plan exception is still considerably broader than at common law. The State can admit evidence of a "plan" simply by showing that the defendant has previously committed the same type of crime in a markedly similar manner.

But similarity between crimes, even marked similarity, is not evidence of an actual plan, which requires an "overall design or objective," *Webster's Third New International Dictionary* 1729 (1976); *see also The American Heritage Dictionary of the English Language* 1001-02 (1976) (defining "plan" as "a systematic arrangement of details"), or larger scheme, *Ness*, 707 N.W.2d at 687.

The identity exception has also expanded, which has further contributed to the overlap between the two exceptions. Though we still apply the identity exception to signature crimes, we have loosened its requirements over time to include crimes that are committed in a substantially similar manner, including those connected by time and place. *See State v. Cogshell*, 538 N.W.2d 120, 124 (Minn. 1995). In fact, prior to our decision in *Ness*, the two exceptions were identical, each applying when a subsequent crime is substantially similar to a prior bad act. Now, by virtue of *Ness*, the common-scheme-or-plan exception is just a narrower version of the identity exception.

## II.

In my opinion, the Advisory Committee for the Rules of Evidence should consider whether an amendment to Rule 404(b) would resolve the inconsistency that *Forsman* created and *Ness* attempted to fix. The common and ordinary meaning of the word "plan" is consistent with our earliest articulations of the plan exception, including from *Sweeney*. *Compare Webster's Third New International Dictionary* 1729 (1976) (defining "plan" as an "orderly arrangement of parts in terms of an overall design or objective"), *with Sweeney*, 180 Minn. at 455, 231 N.W. at 227 (requiring a "composite plan"). With no indication that the Rules of Evidence intended to abrogate the common law, there is no reason for us to

continue to struggle with the plan exception when a return to the common-law rule would resolve the conflict. *See* Minn. R. Evid. 404(b) committee cmt. (1977) ("The rule is generally consistent with the common law doctrine that character evidence is not admissible to prove that an individual acted in conformity with his character on a specific occasion. Certain exceptions to this general doctrine are contained in the rule."). Nor is there any reason for two discrete exceptions—identity and plan—to overlap with one another.

The approaches of many federal courts are also consistent with the common law. For example, in some circuits, the plan exception only extends to prior bad acts that were committed within the same composite scheme or plan as the charged offense. *See, e.g.*, *United States v. Carroll*, 207 F.3d 465, 468 (8th Cir. 2000) ("In some circumstances, a defendant's prior bad acts are part of a broader plan or scheme relevant to the charged offense."); *United States v. Lynn*, 856 F.2d 430, 435 (1st Cir. 1988) (declining to admit the defendant's previous drug offense to show a "common scheme" because nothing suggested that the defendant's previous and current drug offenses were related, "but for involvement with the same illicit substance"); *Lewis v. United States*, 771 F.2d 454, 455-56 (10th Cir. 1985) (admitting evidence of a defendant's burglary of a local garage store, when the defendant intended to use the cutting torch and other supplies in a plan to burglarize a post office later that evening). In fact, an attorney who appears in both federal and state court in Minnesota has to learn our unique rules in addition to those of the Eighth Circuit, which continues to adhere strictly to the common-law rules on identity and plan evidence under Fed. R. Evid. 404(b). *See Carroll*, 207 F.3d at 468 (explaining that identity evidence

requires a signature and plan evidence requires "a broader plan or scheme" under Rule 404(b)).

I fully understand that, other than in *Ness*, we have been quite reluctant to change our approach to the interpretation of Rule 404(b). For example, in one case, we rejected the narrowing of the plan exception for cases involving sexual assault, stating that we had "repeatedly upheld admission of [other-bad-acts] evidence in cases" involving rape or sexual abuse. *See State v. Wermerskirchen*, 497 N.W.2d 235, 240-41 (Minn. 1993). But my reading of *Wermerskirchen* is that our reluctance to reconsider our law was due, in large part, to the weight of precedent in the particular area in which the call for change arose, not some general inflexibility to reconsider *any* aspect of Rule 404(b). Besides, an overly strict reading of *Wermerskirchen* fails to account for what we later held in *Ness*, which itself was a retreat from a longstanding, post-*Forsman* interpretation of the plan exception. I do not read *Wermerskirchen*, in other words, as foreclosing the possibility of allowing the Advisory Committee on the Rules of Evidence to consider an amendment to Minn. R. Evid. 404(b), which, as now interpreted, treats the plan exception as mere surplusage and conflicts with the categorical prohibition on using other-bad-acts evidence as propensity evidence.